**Michigan Supreme Court**
**Lansing, Michigan**

# Opinion

Chief Justice:
Clifford W. Taylor

Justices:
Michael F. Cavanagh
Elizabeth A. Weaver
Marilyn Kelly
Maura D. Corrigan
Robert P. Young, Jr.
Stephen J. Markman

FILED JULY 24, 2006

BRUCE B. FEYZ, M.D.,

     Plaintiff-Appellee,

v

No. 128059

MERCY MEMORIAL HOSPITAL;
MEDICAL STAFF OF MERCY MEMORIAL
HOSPITAL; RICHARD HILTZ, JAMES
MILLER, D.O.; JOHN KALENKIEWICZ, M.D.;
J. MARSHALL NEWBERN, D.O.; and
ANTHONY SONGCO, M.D.,

     Defendants-Appellants.

_____

BEFORE THE ENTIRE BENCH

YOUNG, J.

Plaintiff is a physician with staff privileges at defendant Mercy Memorial Hospital. This lawsuit arises from an internecine dispute over nursing orders for patient intake at the defendant hospital. Plaintiff's insistence on requiring the nursing staff to use his special standing orders instead of defendant hospital's standing orders eventually led to a conflict with defendant hospital and a peer review of plaintiff's professional practices as well as disciplinary action.

Plaintiff's challenge of the peer review conducted by some of the defendants and the resulting disciplinary action taken against him requires that we consider the scope of immunity provided for peer review. In order to promote effective patient care in hospitals, the Legislature enacted MCL 331.531, commonly referred to as Michigan's peer review immunity statute. The purpose of statutory peer review immunity is to foster the free exchange of information in investigations of hospital practices and practitioners, and thereby reduce patient mortality and improve patient care within hospitals. The Legislature obviously intended to protect peer review participants from liability for participation in this communicative and evaluative process. In order to create an environment in which such candid explorations of the quality of hospital patient care can occur, among other protections, the Legislature prohibited the discovery of communications made within the peer review process and granted immunity from liability to all who participate in peer review without "malice."

The primary question posed in this appeal is the scope of judicial review of peer review permitted under MCL 331.531. A secondary question is whether the judicially created "doctrine of nonintervention"—a doctrine suggesting that staffing decisions of private hospitals are generally beyond the scope of judicial review—is compatible with the peer review immunity statute. Finally, we must also construe the undefined peer review statutory term "malice."

Because the peer review immunity statute establishes qualified immunity from liability for peer review communication and participants who provide such communications, we conclude that there is no justification for recognizing the nonintervention doctrine that the lower courts in this state have applied in considering claims arising from peer review. We therefore hold that this doctrine cannot supplement or supplant the statutory immunity granted by our Legislature. Furthermore, there is no basis, statutory or otherwise, to justify the application of a nonintervention doctrine to general staffing decisions of a private hospital. We also hold that, consistent with the objects of the peer review immunity statute, malice should be defined as set forth by the Court of Appeals in *Veldhuis v Allan*.[1] Thus, we hold that malice can be established when a "person supplying information or data [to a peer review entity] does so with knowledge of its falsity or with reckless disregard of its truth or falsity. Similarly, a review entity is not immune from liability if it acts with knowledge of the falsity, or with reckless disregard of the truth or falsity, of information or data which it communicates or upon which it acts."[2]

Accordingly, we vacate the judgment of the Court of Appeals and remand this case to the Monroe Circuit Court for further proceedings consistent with this opinion.

_____

[1] 164 Mich App 131; 416 NW2d 347 (1987).

# FACTS AND PROCEDURAL HISTORY[3]

Plaintiff is a physician with staff privileges at defendant Mercy Memorial Hospital.[4] Plaintiff was dissatisfied with defendant hospital's standard nursing policy requiring nurses to document patients' prescribed medications and dosages by either copying the label on their prescription containers or copying a list of medications carried by patients. As a consequence, plaintiff created his own specialized orders directing the nursing staff to obtain very specific information from plaintiff's incoming patients about their prescription drug use. Plaintiff's orders directed the nursing staff, as part of the admissions process for his patients, to assume a far more aggressive investigative role regarding patient medication.[5]

---

(…continued)

[2] *Id.* at 136-137 (citation omitted).

[3] Because this case was dismissed pursuant to MCR 2.116(C)(8), all material facts are taken from plaintiff's complaint.

[4] According to plaintiff's complaint, the individual defendants hold various administrative positions at defendant hospital. Defendant Medical Staff of Mercy Memorial Hospital is "the organization of health care providers who provide health care to patients" at defendant Mercy Memorial Hospital.

[5] According to plaintiff's complaint, plaintiff's standing orders required nurses to do the following:

A. Have the family bring in home medications.

B. Ask the patient (if alert) if the containers belong to the medications. If not, send the container(s) to the pharmacy for identification.

(continued…)

Defendants disapproved plaintiff's standing orders, and instructed the nursing staff to ignore them. In several cases where the nurses disregarded plaintiff's special orders and followed defendant hospital's nursing directives, plaintiff prepared "incident reports" referring such cases to peer review committees for investigation of "potential medical errors." Further, plaintiff began making notations in patient records that his disregarded orders were intended to "[p]revent serious medication errors in the past."

Defendants initiated peer review proceedings against plaintiff based on plaintiff's failure to complete medical records[6] and his insistence that the nursing staff follow his standing orders rather than comply with hospital policy. An ad hoc investigatory committee reviewed plaintiff's conduct and released its findings to the executive committee of defendant medical staff.[7] Relying on the ad hoc

_____

(…continued)

> C.  Ask the patient to look at his/her medications inside the container and tell how he/she has been taking them at home.

> D.  List the dose and frequency of medications taken on the nursing assessment form as the patient is actually taking them at home.

[6] Plaintiff admits that he refused to comply with hospital policy requiring physicians to sign transcriptions of their verbal orders.

[7] Because this case was decided on motion solely on the basis of plaintiff's pleadings, it is not clear whether the ad hoc investigatory committee and the executive committee were duly authorized "peer review" entities. It is not necessary to the resolution of this appeal that we determine their status. We therefore express no opinion on this issue.

5

committee's report, the executive committee referred plaintiff to the Health Professionals Recovery Program (HPRP) for a psychiatric examination.[8] Plaintiff was placed on temporary probation.

Plaintiff alleges that he ceased writing his standard orders because, in compromise, defendant hospital gave plaintiff use of the pharmacy consult service to implement plaintiff's special orders. It appears that plaintiff's orders regarding patient medication overburdened the staff of the pharmacy consult service, so the hospital eventually discontinued this arrangement. Thereafter, plaintiff resumed placing his specialized orders in patients' medical charts. As a consequence, defendants took further action and placed plaintiff on indefinite probation. Plaintiff continues to practice medicine and retains privileges at defendant hospital, but is restricted from using defendant hospital's pharmacy consult service or insisting on compliance with his special orders.

Plaintiff filed a complaint alleging violations of the Persons with Disabilities Civil Rights Act,[9] the Americans with Disabilities Act,[10] the Rehabilitation Act of 1973,[11] and 42 USC 1983 and 1985; invasion of privacy; breach of fiduciary and public duties; and breach of contract. The trial court

---

[8] See MCL 333.16223.

[9] MCL 37.1101 *et seq*.

[10] 42 USC 12101 *et seq*.

[11] 29 USC 794.

granted summary disposition to defendants, concluding that all of defendants' actions arose out of the peer review process and therefore defendants were immune from liability under MCL 331.531. The court, as an alternative basis for granting summary disposition, relied on the doctrine of judicial nonintervention, which provides that courts will not review private hospitals' staffing decisions.

The Court of Appeals, in a split decision, partially reversed the trial court's award of summary disposition in favor of defendants,[12] concluding that peer review immunity did not apply to statutory civil rights claims. The majority concluded that an alleged civil rights violation was not within the scope of peer review and that an alleged civil rights violation was "a malicious act."[13] Furthermore, the majority held that the nonintervention doctrine did not prevent plaintiff from pursuing his civil rights claims, nor did the doctrine generally preclude plaintiff's contract and tort claims. The majority held that the doctrine

---

[12] 264 Mich App 699; 692 NW2d 416 (2005). The Court of Appeals affirmed the dismissal of plaintiff's breach of fiduciary duty claim against all defendants on the basis of the nonintervention doctrine, because such a claim went to the heart of the majority's interpretation of the doctrine—that private hospitals are not subject to greater judicial scrutiny than any other private entity. Furthermore, the Court of Appeals affirmed summary disposition of plaintiff's nonstatutory claims against the members of the ad hoc committee, to the extent those claims were based on the actions of the ad hoc committee while acting in its role as a peer review committee. Plaintiff did not appeal these adverse holdings, and they are not before us.

[13] *Id.* at 704. The Court of Appeals majority used the following definition of malice: "'Malice in law is not necessarily personal hate or ill will, but it is that

(continued…)

7

stands for the limited proposition that a private hospital's staffing decisions are not subject to constitutional due process challenges. The majority concluded that the nonintervention doctrine did not create any greater insulation from judicial scrutiny than that enjoyed by any other private entity. In other words, the majority held that a private hospital's staffing decisions are subject to the same level of judicial review as would apply to the actions of any other private entity.

The Court of Appeals dissent agreed that an unlawful act of discrimination constituted malice,[14] but disagreed that an unlawful discriminatory act was per se outside the scope of a peer review committee.[15] The dissent would have affirmed the trial court's dismissal of plaintiff's tort and contract counts. The dissent also concluded that the majority improperly limited the scope of the nonintervention

---

(…continued)
state of mind which is reckless of law and of the legal rights of the citizen.'" *Id.* at 704-705, quoting Black's Law Dictionary (5th ed).

[14] The dissent relied in part on the following legal definition of "malice": "'The intent, without justification or excuse, to commit a wrongful act.'" *Feyz, supra* at 728 (Murray, P.J., concurring in part and dissenting in part), quoting Black's Law Dictionary (7th ed). The dissent agreed with the majority that MCL 331.531 would not bar valid discrimination claims. However, somewhat inconsistently, the dissent criticized the majority's abandonment of the defamation definition of malice, adopted in *Veldhuis, supra*, and stated that the majority offered no justification or explanation for the abandonment.

[15] Although unstated, given the dissent's preferred definition of malice, it appears that its rejection of a per se application of discriminatory claims as an exception to peer review immunity derives from the fact that not all discriminatory claims require proof of intent. See, e.g., *Raytheon Co v Hernandez*, 540 US 44, 52-53; 124 S Ct 513; 157 L Ed 2d 357 (2003).

8

doctrine. The dissent opined that the nonintervention doctrine precluded judicial review of contract and contract-related tort claims arising from hospital staffing decisions with regard to all defendants.

This Court granted defendants' application for leave to appeal.[16]

STANDARD OF REVIEW

The trial court granted defendants' summary disposition under MCR 2.116(C)(8). A trial court's grant of summary disposition is reviewed de novo.[17] A motion for summary disposition brought pursuant to MCR 2.118(C)(8) tests the legal sufficiency of the complaint on the allegations of the pleadings alone.[18] When a challenge to a complaint is made, the motion tests whether the complaint states a claim as a matter of law, and the motion should be granted if no factual development could possibly justify recovery.[19]

Questions of statutory interpretation, such as the proper construction of the peer review immunity statute, are reviewed de novo.[20] Our role is to give effect to

---

[16] 474 Mich 957 (2005).

[17] *Wickens v Oakwood Healthcare Sys*, 465 Mich 53, 59; 631 NW2d 686 (2001).

[18] *Beaudrie v Henderson*, 465 Mich 124, 129; 631 NW2d 308 (2001).

[19] *Spiek v Dep't of Transportation*, 456 Mich 331, 337; 572 NW2d 201 (1998).

[20] *Ostroth v Warren Regency, GP, LLC*, 474 Mich 36, 40; 709 NW2d 589 (2006).

9

the intent of the Legislature, as expressed by the language of the statute.[21]  We apply clear and unambiguous statutes as written, under the assumption that the Legislature intended the meaning of the words it has used in the statute.[22]  In defining statutory words, we must consider the "plain meaning of the critical word or phrase as well as 'its placement and purpose in the statutory scheme.'"[23]  While words are construed according to their plain and ordinary meaning, words that have acquired a peculiar and appropriate meaning in the law are construed according to that peculiar and appropriate meaning.[24]

ANALYSIS

In Michigan, the Legislature has commanded hospitals to establish peer review committees to review "professional practices" in order to "reduc[e] morbidity and mortality and improv[e] the care provided in the hospital for patients."[25]  That review must "include the quality and necessity of the care

---

[21] *Grimes v Dep't of Transportation*, 475 Mich 72; 715 NW2d 275 (2006).

[22] *Casco Twp v Secretary of State*, 472 Mich 566, 571; 701 NW2d 102 (2005).

[23] *Sun Valley Foods Co v Ward*, 460 Mich 230, 237; 596 NW2d 119 (1999), quoting *Bailey v United States*, 516 US 137, 145; 116 S Ct 501; 133 L Ed 2d 472 (1999).

[24] MCL 8.3a.

[25]  MCL 333.21513 provides, in pertinent part:

The owner, operator, and governing body of a hospital licensed under this article:

(continued…)

10

provided and the preventability of complications and deaths occurring in the hospital."[26]  In turn, hospitals use peer review evaluations when making staffing decisions.[27]

## A. THE JUDICIAL NONINTERVENTION DOCTRINE AND THE SCOPE OF JUDICIAL REVIEW OF PEER REVIEW

The judicial nonintervention doctrine is a judicially created common-law doctrine providing that courts will not intervene in a private hospital's staffing decisions.  The concerns that gave rise to this doctrine are twofold.  The doctrine is premised, in part, on the distinction between public and private hospitals.  While public hospitals are state actors implicating adherence to constitutional requirements, such as affording due process to physicians, private hospitals are not

---

(…continued)

\* \* \*

(d) Shall assure that physicians and dentists admitted to practice in the hospital are organized into a medical staff to enable an effective review of the professional practices in the hospital for the purpose of reducing morbidity and mortality and improving the care provided in the hospital for patients. The review shall include the quality and necessity of the care provided and the preventability of complications and deaths occurring in the hospital.

[26] *Id.*

[27] See *Attorney General v Bruce*, 422 Mich 157; 369 NW2d 826 (1985). "Hospitals are required to establish peer review committees whose purposes are to reduce morbidity and mortality and to ensure quality of care.  Included in their duties is the obligation to review the professional practices of licensees, granting staff privileges consistent with each licensee's qualifications."  *Id.* at 169 (internal citations omitted).

11

similarly constrained because they are not state actors.[28]  Therefore, it was posited that a private hospital's staffing decisions merit less judicial scrutiny.

The doctrine is also founded on the belief that courts are ill-equipped to review hospital staffing decisions because courts lack the specialized knowledge and skills required to adjudicate hospital staffing disputes.  The judicial nonintervention doctrine, therefore, is a prudential doctrine not grounded in statutory or constitutional provisions that courts have invoked to resist adjudicating claims involving hospital staffing decisions and the decision-making process.[29]

In *Shulman v Washington Hosp Ctr*,[30] a seminal case describing the doctrine, the United States District Court for the District of Columbia explained its foundational premises as follows:

> Judicial tribunals are not equipped to review the action of hospital authorities in selecting or refusing to appoint members of medical staffs, declining to renew appointments previously made, or excluding physicians or surgeons from hospital facilities.  The authorities of a hospital necessarily and naturally endeavor to their

---

[28] *Derderian v Genesys Health Care Sys*, 263 Mich App 364, 376-377; 689 NW2d 145 (2004), lv den 474 Mich 955 (2005).

[29] See *id*.  The judicial nonintervention doctrine does not deprive a court of subject-matter jurisdiction as some Court of Appeals panels have erroneously concluded.  *Id.* at 377 n 5, citing *Veldhuis v Central Michigan Community Hosp*, 142 Mich App 243; 369 NW2d 478 (1985), and *Bhogaonker v Metro Hosp*, 164 Mich App 563; 417 NW2d 501 (1987).  Rather, the doctrine is one of self-restraint where courts decline to exercise jurisdiction.

[30] 222 F Supp 59, 64 (D DC, 1963).

utmost to serve in the best possible manner the sick and the afflicted who knock at their door. Not all professional men, be they physicians, lawyers, or members of other professions, are of identical ability, competence, or experience, or of equal reliability, character, and standards of ethics. The mere fact that a person is admitted or licensed to practice his profession does not justify any inference beyond the conclusion that he has met the minimum requirements and possesses the minimum qualifications for that purpose. Necessarily hospitals endeavor to secure the most competent and experienced staff for their patients. Without regard to the absence of any legal liability, the hospital in admitting a physician or surgeon to its facilities extends a moral imprimatur to him in the eyes of the public. Moreover not all professional men have a personality that enables them to work in harmony with others, and to inspire confidence in their fellows and in patients. These factors are of importance and here, too, there is room for selection. In matters such as these the courts are not in a position to substitute their judgment for that of professional groups.

Relying on *Shulman*, the Michigan Court of Appeals adopted the doctrine of judicial nonintervention in *Hoffman v Garden City Hosp*.[31] The plaintiff in *Hoffman* sued a private hospital for denying him staff privileges, claiming, in part, that the hospital's decision to deny privileges was "arbitrary, capricious and unreasonable . . . ."[32] The defendant prevailed in the trial court on its motion for summary disposition. On appeal, the plaintiff urged the Court of Appeals to adopt the position that a private hospital holds a fiduciary duty to make its staffing decisions reasonably and for the public good.[33] The plaintiff argued that the

---

[31] 115 Mich App 773; 321 NW2d 810 (1982).

[32] *Id.* at 776.

[33] See *Greisman v Newcomb Hosp*, 40 NJ 389; 192 A2d 817 (1963).

defendant hospital's decision was "so 'affected with a public interest'" that it should be subject to judicial review.[34] The *Hoffman* panel rejected this argument and, in affirming the trial court, adopted the position articulated in *Shulman* that a private "hospital's reasons for denying staff privileges" and "the decisions of the governing bodies of private hospitals are not subject to judicial review."[35]

In subsequent cases, the Court of Appeals relied on, as well as expanded, the judicial nonintervention doctrine set forth in *Hoffman*.[36] For example, in *Sarin v Samaritan Health Ctr*,[37] the Court of Appeals affirmed summary disposition of the plaintiff doctor's breach of contract and tort claims arising out of an alleged breach of the hospital's bylaws. *Sarin* held that the doctrine precluded judicial review not only of a private hospital's decision on staff privileges, but also "'the method by which the hospital personnel reached that decision,'"[38] because judicial

---

[34] *Hoffman, supra* at 777.

[35] *Id.* at 778, 779, citing *Shulman, supra*.

[36] See *Regualos v Community Hosp*, 140 Mich App 455, 460-461; 364 NW2d 723 (1985); *Veldhuis v Central Michigan Community Hosp, supra*; *Dutka v Sinai Hosp of Detroit*, 143 Mich App 170; 371 NW2d 901 (1985); *Bhogaonker, supra*.

[37] 176 Mich App 790, 793-794; 440 NW2d 80 (1989).

[38] *Id*. at 794, quoting *Veldhuis v Central Michigan Community Hosp, supra* at 247.

review of those claims would require courts to "interven[e] in the hospital's [staffing] decision and interfer[e] with the peer review process." [39]

More recently, in *Long v Chelsea Community Hosp*,[40] the Court of Appeals refined the scope of the nonintervention doctrine, and opined that the doctrine could not bar judicial review of *all* legal claims related to staffing decisions. The panel stated that the doctrine

> is limited to disputes that are contractual in nature. We decline to articulate a broad principle that a private hospital's staffing decisions may *never* be judicially reviewed. Indeed, in doing so, we reiterate the proposition from *Sarin* that, under some circumstances, a court may consider a hospital's decisions without violating the nonintervention principle. Private hospitals do not have carte blanche to violate the public policy of our state as contained in its laws. Had plaintiff in this case asserted that defendants violated state or federal law, we may have chosen to review his claim. In this case, however, plaintiff did not assert a violation of civil rights or a violation of a state statute.[41]

*Long* confined the scope of the judicial nonintervention doctrine to disputes arising out of those decisions that are "contractual in nature."[42]

---

[39] *Sarin, supra* at 795.

[40] 219 Mich App 578; 557 NW2d 157 (1997). The issue in *Long* was whether MCL 331.531 created a private cause of action for malice. The Court of Appeals concluded that the statute created no such private cause of action. The Court also dismissed the plaintiff's breach of contract claim on the basis of the judicial nonintervention doctrine.

[41] *Long, supra* at 586-587 (citation omitted).

[42] *Id.* at 586.

15

In this case, the Court of Appeals majority largely abandoned the *Hoffman* rule that a private hospital's staffing decisions are simply not subject to judicial review. Instead, it concluded that the judicial nonintervention doctrine only stood for the "modest proposition that a private hospital is subject only to the legal obligations of a private entity, not to the greater scrutiny of a public institution."[43] Fundamental to the majority's reinterpretation of the doctrine and retreat from earlier case law was the fact that only *Long* was binding precedent.[44] Therefore, it embraced *Long's* suggestion that private hospitals might be subject to statutory civil rights claims. With regard to breach of contract claims, the *Feyz* majority held that liability may be imposed as long as the breach of contract claim would not subject a private hospital to greater liability than what another private entity would face.

While Court of Appeals panels have utilized variants of the doctrine of nonintervention for some years, this Court has never recognized or adopted the doctrine. Defendants urge this Court to adopt the doctrine and hold that the trial court properly dismissed plaintiff's nonstatutory claims because those claims require a review of the hospital's staffing decisions and the methods employed in reaching those decisions. We decline to do so because this judicially created

---

[43] *Feyz, supra* at 723.

[44] *Id.*; see MCR 7.215(J)(1).

nonintervention doctrine is inconsistent with the statutory regime governing the peer review process enacted by the Legislature.

The statutorily prescribed scope of judicial review over the peer review process is very narrow. The Legislature codified limited judicial review of the peer review process, permitting judicial review only when peer review participants act with malice.[45] Contrary to the outcomes of cases such as *Hoffman, Sarin,* and *Long,* which afforded common-law immunity to hospitals, the hospital itself is not a protected review entity under the legislatively enacted peer review immunity statute.[46] The Legislature could have permitted unqualified peer review immunity or extended it beyond the participants in the peer review process, but did not do so. Our courts must respect this policy choice. The nonintervention doctrine, which, in some formulations,[47] precludes all judicial review of contract and tort claims that might have some relationship to peer review, is inconsistent with the

---

[45] MCL 331.531. However, as the Court of Appeals stated in *Long, supra*, MCL 331.531 does not create a private cause of action for malice. Malice is an exception to peer review immunity. Once a defendant has stated sufficient facts constituting peer review immunity, MCR 2.111(F)(3), a plaintiff has to put forward sufficient evidence of malice to invoke the exception to immunity. This burden is separate from the plaintiff's burden to state a viable legal claim.

[46] MCL 331.531(2) specifically delineates which groups qualify as "review entities" entitled to peer review immunity. While a duly appointed peer review committee of a hospital is a designated review entity under MCL 331.531(2)(a)(*iii*), the hospital is not. Therefore, the hospital cannot take advantage of the immunity granted under MCL 331.531(3)(b), which grants immunity only to review entities for acts or communications within their scope.

17

legislative mandate that covers protection of the peer review communicative process only. The doctrine permits courts to supplant the policy choice made by the Legislature. Because "'"[c]ourts cannot substitute their opinions for that of the legislative body on questions of policy,"'"[48] we decline to recognize the judicial nonintervention doctrine.[49]

Additionally, we are not persuaded by the argument that courts are incompetent to review hospital staffing decisions as a basis for adopting the judicial nonintervention doctrine. This claim overlooks the reality that courts routinely review complex claims of all kinds. Forgoing review of valid legal claims, simply because those claims arise from hospital staffing decisions, amounts to a grant of unfettered discretion to private hospitals to disregard the legal rights of those who are the subject of a staffing decision, even when such decisions are precluded by statute. This is not to say that hospital staffing

---

(…continued)

[47] See, e.g., *Sarin, supra* at 795.

[48] *People v McIntire*, 461 Mich 147, 153; 599 NW2d 102 (1999) quoting the dissenting opinion of Young, P.J., in the Court of Appeals in that case quoting *Cady v Detroit*, 289 Mich 499, 509; 286 NW 805 (1939). See also *Beaudrie, supra* at 140, where this Court refused to expand the judicially created public duty doctrine because such an expansion would have undermined the public policy choice of the Legislature, as expressed in the governmental tort liability act, which allows public employees to be subject to tort liability in limited circumstances.

[49] We note that the Legislature provided for the qualified immunity found in MCL 331.531 in 1975, *seven years* before the Court of Appeals adopted the judicial nonintervention doctrine.

18

decisions, which involve specialized medical and business knowledge and considerations, are not entitled to some measure of deference. However, when those staffing decisions violate the legal rights of others, the judiciary must exercise its obligation to adjudicate legal disputes, except to the extent that the citizens of this state, through their elected representatives, have made a policy choice to shield such decisions from liability.

## B. PEER REVIEW IMMUNITY

Peer review is ""'"essential to the continued improvement in the care and treatment of patients. Candid and conscientious evaluation of clinical practices is a *sine qua non* of adequate hospital care."'"[50] In order to promote "the willingness of hospital staff to provide their candid assessment" in peer review proceedings,[51] the Legislature has enacted two primary measures to protect peer review activities from intrusive public involvement and from litigation. First, the Legislature has provided that the records, data, and knowledge collected for or by peer review entities are confidential and not discoverable.[52] Furthermore, and relevant to this

---

[50] *Dorris v Detroit Osteopathic Hosp Corp*, 460 Mich 26, 42; 594 NW2d 455 (1999), quoting *Attorney General, supra* at 169, quoting *Bredice v Doctors Hosp, Inc*, 50 FRD 249, 250 (D DC, 1970), aff'd without opinion 156 US App DC 199; 479 F2d 920 (1973).

[51] *Dorris, supra* at 42; *Attorney General, supra* at 169.

[52] MCL 333.21515, MCL 333.20175(8), and MCL 331.533. Peer review records have thus been fully protected from disclosure even to the Attorney General when conducting a criminal investigation. *Attorney General, supra* at

(continued…)

19

case, the Legislature has granted immunity to persons, organizations, and entities that provide information to peer review groups or perform protected peer review communicative functions.[53]

---

(…continued)

168-170; *In re Investigation of Lieberman*, 250 Mich App 381; 646 NW2d 199 (2002). Moreover, these nondisclosure protections apply regardless of the nature of the claim asserted by the party seeking the records. *Manzo v Petrella & Petrella & Assoc, PC*, 261 Mich App 705, 715; 683 NW2d 699 (2004).

[53] MCL 331.531 provides in pertinent part:

> (1) A person, organization, or entity may provide to a review entity information or data relating to the physical or psychological condition of a person, the necessity, appropriateness, or quality of health care rendered to a person, or the qualifications, competence, or performance of a health care provider.

> (2) As used in this section, "review entity" means 1 of the following:

> (a) A duly appointed peer review committee of 1 of the following:
>
> * * *
>
> (*iii*) A health facility or agency licensed under article 17 of the public health code, 1978 PA 368, MCL 333.20101 to 333.22260.
>
> * * *

> (3) A person, organization, or entity is not civilly or criminally liable:

(continued…)

The peer review immunity statute protects a person, organization, or entity from civil and criminal liability when carrying out three types of protected peer review tasks. First, immunity protects those that provide information or data to a review entity pursuant to MCL 331.531(1). Second, it protects specific "review entities," such as a duly appointed peer review committee of a hospital,[54] for those acts or communications within its scope as a review entity. Finally, subject to MCL 331.532[55] and MCL 331.533,[56] immunity applies to those who release or

(…continued)

> (a) For providing information or data pursuant to subsection (1).
>
> (b) For an act or communication within its scope as a review entity.
>
> (c) For releasing or publishing a record of the proceedings, or of the reports, findings, or conclusions of a review entity, subject to sections 2 and 3.
>
> (4) The immunity from liability provided under subsection (3) does not apply to a person, organization, or entity that acts with malice.

[54] MCL 331.531(2)(a)(*iii*). As noted earlier, hospitals themselves are not listed protected review entities.

[55] MCL 331.532 provides that the release or publication of peer review records, reports, findings, and conclusions shall be only for the following purposes: (1) advancing health care research or education, (2) maintaining the standards of health care professions, (3) protecting the financial integrity of any governmentally funded program, (4) providing evidence relating to the ethics or discipline of a health care provider, entity, or practitioner, (5) reviewing the qualifications, competence, and performance of a health care professional with respect to the selection and appointment of the professional to a health facility's

(continued…)

21

publish a record of peer review proceedings, or the reports, findings, or conclusions of a review entity.

However, peer review immunity is not absolute. A person, organization, or entity that has acted with malice when engaging in a peer review function is not protected from liability.[57] Because the Legislature did not define "malice," we must determine what constitutes malice for purposes of peer review immunity. We are guided by the Legislature's directive that words that have acquired a peculiar and appropriate meaning in the law shall be construed according to that peculiar and appropriate meaning.[58] "Malice" is clearly a word that has acquired a peculiar meaning in the law. Indeed, reference to any legal dictionary confirms that "malice" has acquired *several* peculiar meanings, depending on the context in

---

(…continued)

medical staff, and (6) complying with § 20175 of the Public Health Code, MCL 333.20175.

[56] MCL 331.533 provides that "the record of a proceeding and the reports, findings, and conclusions of a review entity and data collected by or for a review entity . . . are confidential, are not public records, and are not discoverable and *shall not be used as evidence in a civil action or administrative proceeding*." (Emphasis added.)

[57] MCL 331.531(4). The immunity provided under MCL 331.531 is separate and distinct from the immunity provided by MCL 333.16244 for a person who acts in good faith in making a report to the HPRP. MCL 333.16244 establishes a presumption that a person who makes such a report acted in good faith. This reporting immunity is not predicated on participation in peer review.

[58] MCL 8.3a.

22

which it used. Our task in this case is to discern which peculiar meaning of "malice" is the most appropriate for purposes of the peer review immunity statute.

The proper definition of "malice" for purposes of peer review immunity is an issue of first impression in this Court. Over the years, Court of Appeals panels have employed several divergent definitions. For instance, in *Veldhuis v Allan*, *supra*, the Court of Appeals adopted the defamation definition of "actual malice."[59] The panel in *Veldhuis v Allan* held that the statutory immunity accorded to peer review activities does not apply "if the person supplying information or data does so with knowledge of its falsity or with reckless disregard of its truth or falsity. Similarly, a review entity is not immune from liability if it acts with knowledge of the falsity, or with reckless disregard of the truth or falsity, of information or data which it communicates or upon which it acts."[60]

In this case, the Court of Appeals majority and dissent each adopted a different definition of "malice." The majority quoted Black's Law Dictionary (5th ed) for the proposition that "'[m]alice in law is not necessarily personal hate or ill will, but it is that state of mind which is reckless of law and of the legal rights of

---

[59] See *New York Times Co v Sullivan*, 376 US 254, 279-280; 84 S Ct 710; 11 L Ed 2d 686 (1964); *J & J Constr Co v Bricklayers & Allied Craftsmen*, 468 Mich 722, 731; 664 NW2d 728 (2003); *Lins v Evening News Ass'n*, 129 Mich App 419; 342 NW2d 573 (1983). It bears noting that the peer review immunity statute was amended to include the malice exception to immunity after the seminal *New York Times v Sullivan* case was decided. It is fair to say that *Sullivan* made a seismic change in the law concerning defamatory communications.

23

the citizen.'"[61]  Using this definition, the Court of Appeals concluded that because

civil rights acts establish citizens' legal rights, acting in disregard of those rights

represents a malicious act outside the scope of immunity granted under MCL

331.531.

Defendants contend that the defamation definition of "malice" utilized in

*Veldhuis v Allan* is the appropriate standard for defining malice under MCL

331.531.  We agree.[62]  In defining malice for purposes of MCL 331.531(4), it is

---

(…continued)

[60] *Veldhuis v Allan, supra* at 136-137 (citation omitted).

[61] *Feyz, supra* at 704-705.

[62] Justice Cavanagh concludes, largely by referencing a legal dictionary, that the Legislature intended a different definition of "malice" than we adopt today.  Indeed, as the dissent correctly contends, reference to dictionaries may be "helpful" in ascertaining legislative intent.  *Post* at 2, citing *Ford Motor Co v Woodhaven*, 475 Mich 425; 716 NW2d 247 (2006).  However, because a word can have many different meanings depending on the context in which it is used, and because dictionaries frequently contain multiple definitions of a given word, in light of this fact, it is important to determine the most pertinent definition of a word in light of its context.  See, e.g., *Horace v City of Pontiac*, 456 Mich 744, 756; 575 NW2d 762 (1998).  That the definition of "malice" we adopt today has been termed "actual malice" is not dispositive.  We readily acknowledge that the word "malice" has a number of definitions; "actual malice" is simply one of the many terms that fall under the general umbrella of "malice."  See Black's Law Dictionary (8th ed).  However, what is critical to our analysis is that "[w]ords are given meaning by context or setting."  *Consumers Power Co v Pub Serv Comm*, 460 Mich 148, 163 n 10; 596 NW2d 126 (1999), citing *Tyler v Livonia Pub Schools*, 459 Mich 382, 391; 590 NW2d 560 (1999).  Peer review is a communicative process seeking to improve patient care through internal self-regulation.  Given this context, we believe that the defamation definition of "malice" most appropriately furthers the Legislature's intent in providing immunity to peer review participants.  It is unclear to us why Justice Cavanagh

(continued…)

24

our duty "to discern and give effect to the intent of the Legislature."[63] To give such effect we must consider the "plain meaning of the critical word or phrase as well as 'its placement and purpose in the statutory scheme.'"[64] Peer review is a communicative process, designed to foster an environment where participating physicians can freely exchange and evaluate information without fear of liability if the hospital ultimately relies on peer review evaluations and adversely affects the reviewed physician's hospital privileges. It is obvious that peer review immunity is designed to promote free communications about patient care practices, as both the furnishing of information to the peer review entity and the proper publication of peer review materials are acts which are granted immunity. All the protected activities relate to the exchange and evaluation of such information. Moreover, the peer review statutory regime protects peer review from intrusive general public scrutiny. All the peer review communications are protected from discovery and use in any form of legal proceeding.

---

(…continued)
selects—from among all the available definitions of "malice"—the definition he has chosen.

[63] *Sun Valley Foods, supra* at 236.

[64] *Id.* at 237, quoting *Bailey v United States, supra* at 145.

The proper definition of "malice" for purposes of the exception to peer review immunity must be gleaned from this communicative context.[65] The defamation definition of "malice" first used by the panel in *Veldhuis v Allan* most clearly comports with the statutory process established by the Legislature, because it is the one definition that specifically concerns and promotes honest communication. Moreover, the purpose of the malice exception is to keep physicians focused on performing honest and candid peer review, while protecting peer review participants from liability for every negative outcome that may be a by-product of such communication. The defamation definition of "malice" is uniquely addressed to communications and most effectively furthers this primary function of peer review.

---

[65] We note that MCL 331.531(3)(b) provides immunity to a review entity for all non-malicious *acts or communications within its scope* as a review entity. Indeed, it is difficult to conceive of an "act" that a properly functioning hospital peer review entity could perform that is not communicative in nature. The gathering and evaluating of information, as well as making recommendations based on that evaluation, are indeed "acts." But these "acts" certainly also have a fundamental communicative aspect. Indeed, these acts are so inherently communicative that were a peer review entity to perform them in such a manner as to interfere with the purpose of keeping physicians focused on performing honest and candid peer review—to distort the peer review process without regard to the truth or falsity of the information it gathers or uses—such actions would also necessarily be communicative in nature and subject to the malice standard we adopt today. Moreover, if a hospital peer review entity were performing non-communicative, non-evaluative "acts"—namely acts that do not advance the goal of the statute to improve delivery of hospital care—such "acts" are arguably not afforded immunity because they presumably would not be within the scope of the hospital peer review entity's function.

Under the "malice" definition used by the *Feyz* Court of Appeals majority, every potential invasion of a physician's legal rights committed during peer review, regardless of the triviality of the act or the absence of knowledge of the inaccuracy of the information relied upon, would abrogate immunity. Such a definition of "malice" would undermine the peer review process by transforming it into a legalistic, rights-driven process rather than its proper statutory mission— honest professional medical evaluation of information about hospital patient practices.[66] This result is inconsistent with the statutory goals of the peer review process and the stringent protections afforded to communicators and communications made in peer review. In providing the extensive immunity for peer review, the Legislature was obviously aware that such protections might insulate from review and sanction the participants' liability for some adverse outcomes for physicians ultimately found by a credentialing hospital to lack the requisite professional skills or standards. Such adverse outcomes equally obviously were not, in and of themselves, deemed by the Legislature to be cause for liability for those participating in the peer review process. However, making

---

[66] It is noteworthy that the Legislature chose the unusual term "*malice*" rather than a more common term such as "intent" as an exception to the immunity granted. As stated, we believe that this is because the focus of the peer review process narrowly concerns communications and the defamation definition of "malice" is inexorably tied to communications. Equally significant, this definition became widely known following the publication of *New York Times v Sullivan*, *supra*.

unfavorable evaluations, determinations, and recommendations based on negative information the peer review entity knows to be false would satisfy the malice standard we adopt.[67] We conclude, based on the language and structure of this statute, that utilizing and acting on information known to be false is the type of activity that the Legislature intended to prevent by including the malice exception to immunity. The defamation definition of "malice" promotes the goals of peer review because peer review participants are not protected if they are not performing evaluations with a focus on improving patient care, but rather on the basis of false extraneous factors unrelated to patient care.

## C. HOSPITAL STAFFING DECISIONS ARE NOT IMMUNE FROM LIABILITY

Our lower courts have made broad use of the now-repudiated nonintervention doctrine that provided, in some formulations, blanket immunity for any staffing decision associated with peer review. We believe that the widespread use of this doctrine has caused some confusion concerning the relationship between the immunity granted to participants in the peer review process and the nature of liability imposed on the actual decision maker in hospital staffing questions, namely, the hospital itself. As stated, decisions such as

---

[67] This is especially true because any disciplinary action taken against the physician on the basis of peer review findings would have to be disclosed upon request to any other hospital from which the physician is seeking staff privileges, credentials, or employment. See MCL 331.531(6) and MCL 333.20175(6).

28

*Hoffman, Sarin,* and *Long* applied the common-law immunity provided by the nonintervention doctrine to hospitals without regard to the fact that the statute itself grants immunity only to enumerated peer review participants and their communications. Hospitals are not similarly covered by the peer review statute. It appears that judicial reliance on the sweeping nonintervention doctrine obviated the necessity of examining whether a hospital, as decision maker, was entitled to the immunity provided by the statute.

In this case, defendants clearly assume and argue that an expansive construction of the peer review immunity statute will insulate the *hospital* defendant from liability. Contrarily, the Court of Appeals majority and dissent sought to construe the peer review immunity statute in a way to avoid insulating the hospital from liability for civil rights claims.[68] None of these positions comports with a reasonable construction of the statute before us, and both misapprehend the scope of its protection. It is for this reason that both the majority and dissenting opinions of the Court of Appeals panel in this case strain to impose on the statutory term "malice" a construction that has little to do with the communicative function of the peer review process.

---

[68] It is also important to note that, until the decision in this case, none of the published peer review immunity statute cases involved a civil rights claim or an existing statutory claim. See, e.g., *Long, supra*; *Veldhuis v Allan, supra*; *Regualos, supra.* Indeed, as noted in footnote 40, at least one case involved an effort to create an independent cause of action for malice based on the peer review immunity statute itself.

29

Because of the confusion on this point illustrated by the published peer review Court of Appeals cases, we take this opportunity to clarify that the peer review immunity statute extends only to the communications made, and the participants who make them, in the peer review process, not to the hospital that makes the ultimate decision on staffing credential questions.

Our conclusion is rooted in the language of the immunity statute itself. Nothing in the peer review immunity statute suggests that it applies to any person or entity except those involved in the *communicative* concern of gathering data and evaluating hospital medical practices, as well as those who publish peer review information for the listed proper statutory purposes. It does not apply to the hospital decision maker that might rely upon the work product of a peer review committee. Moreover, MCL 333.21513(a) and (c) designate that the hospital is the statutory decision maker concerning staffing privileges. In other words, the peer review process may assemble and assess data about a physician's competence, and it may even make a recommendation to the hospital leadership bearing on a staffing issue, but it is the *hospital* that remains ultimately and legally responsible for deciding issues relating to staffing privileges.

Thus, the hospital does not fit within the protections afforded by the peer review immunity statute when it makes the ultimate staffing decision. Consequently, if the defendant hospital here is covered by one or more of the several state and federal civil rights acts plaintiff has sued under, and if staffing

30

privileges are an activity protected from discrimination by such state and federal acts, then the hospital is required to defend its decision.[69] What plaintiff may not do in suing the hospital defendant is invade the protections afforded to participants in the peer review process without establishing malice as we have defined it in this opinion.

CONCLUSION

We repudiate the doctrine of judicial nonintervention because it is inconsistent with the statutory peer review process established in MCL 331.531. Furthermore, we hold that malice exists when a person supplying information or data to a peer review entity does so with knowledge of its falsity or with reckless disregard of its truth or falsity. Similarly, a peer review entity is not immune from liability if it acts with knowledge of the falsity, or with reckless disregard of the truth or falsity, of information or data that it communicates or upon which it acts. Although this definition originated in the context of defamation, this definition is uniquely appropriate to Michigan's peer review scheme, as peer review immunity is based on the communication of information about professional activities and standards. Moreover, this definition furthers the purpose of peer review immunity

---

[69] As stated earlier, this case was decided on motion. The merits of plaintiff's statutory claims have not been decided. We express no opinion on the validity of any of plaintiff's claims.

in that it allows those who engage in the peer review process to candidly and honestly evaluate a physician's competence without fear of exposure to liability.

Accordingly, the judgment of the Court of Appeals is vacated, and we remand this case to the Monroe Circuit Court for further proceedings consistent with this opinion.

Robert P. Young, Jr.
Clifford W. Taylor
Maura D. Corrigan
Stephen J. Markman

STATE OF MICHIGAN

SUPREME COURT

BRUCE B. FEYZ, M.D.,

        Plaintiff-Appellee,

v                                          No. 128059

MERCY MEMORIAL HOSPITAL;
MEDICAL STAFF OF MERCY
MEMORIAL HOSPITAL; RICHARD
HILTZ; JAMES MILLER, D.O.; JOHN
KALENKIEWICZ, M.D.; J. MARSHALL
NEWBERN, D.O.; and ANTHONY
SONGCO, M.D.,

        Defendants-Appellants.

_____

CAVANAGH, J. (*concurring in part and dissenting in part*).

I concur with many of the results reached by the majority opinion.

Specifically, I agree that, because MCL 331.531[1] establishes qualified immunity

---

[1] MCL 331.531 provides in relevant part:

        (1) A person, organization, or entity may provide to a review entity information or data relating to the physical or psychological condition of a person, the necessity, appropriateness, or quality of health care rendered to a person, or the qualifications, competence, or performance of a health care provider.

\* \* \*

(continued…)

for peer review entities and participants, there is no justification in this state for recognizing the judicial nonintervention doctrine. I also agree that the judicial nonintervention doctrine should not be applied to a private hospital's general staffing decisions. I disagree, however, with the majority's conclusion that the term "malice," as used in MCL 331.531, should be defined under the principles of "actual malice" in accordance with defamation law.

Notably, the Legislature did not define "malice" in MCL 331.531. Like the majority, I agree that "malice" is a term that has acquired a peculiar and appropriate meaning in the law. Therefore, this Court must construe the term "malice" according to its peculiar and appropriate legal meaning. *Ford Motor Co v Woodhaven*, 475 Mich 425; 716 NW2d 247 (2006); MCL 8.3a. Thus, because "malice" is a legal term, resort to a legal dictionary is helpful. *Ford Motor Co*, *supra* at 440. Reference to a legal dictionary confirms that "malice" is defined as

---

(…continued)

>    (3) A person, organization, or entity is not civilly or criminally liable:
>
>    (a) For providing information or data pursuant to subsection (1).
>
>    (b) For an act or communication within its scope as a review entity.
>
>    (c) For releasing or publishing a record of the proceedings, or of the reports, findings, or conclusions of a review entity, subject to sections 2 and 3.

(continued…)

follows: "The intent, without justification or excuse, to commit a wrongful act" or "[r]eckless disregard of the law or of a person's legal rights." Black's Law Dictionary (7th ed).[2] Because there is no indication that the Legislature intended to alter the meaning of the legal term "malice" or to use any variation of that term that may apply in unrelated contexts,[3] "malice," as used in MCL 331.531 should be interpreted consistently with its legal definition and should not be defined, as the majority does, solely by reference to "actual malice" under defamation law.

Simply stated, the Legislature used the term "malice," not "actual malice." As noted by this Court in *J & J Constr Co v Bricklayers & Allied Craftsmen*, 468 Mich 722, 731; 664 NW2d 728 (2003):

> Under long-settled constitutional principles concerning the First Amendment rights of freedom of speech and freedom of the press, a *public*-figure plaintiff must establish that a defendant made

---

(…continued)

> (4) The immunity from liability provided under subsection (3) does not apply to a person, organization, or entity that acts with malice.

[2] Notably, the Court of Appeals majority concluded that "'[m]alice in law is not necessarily personal hate or ill will, but it is that state of mind which is reckless of law and of the legal rights of the citizen.'" 264 Mich App 699, 704-705; 692 NW2d 416 (2005), quoting Black's Law Dictionary (5th ed). Further, the Court of Appeals partial dissent would have applied the defamation definition of "malice." *Id.* at 726-727 (Murray, P.J., concurring in part and dissenting in part.).

[3] Significantly, "actual malice" is defined as "1. The deliberate intent to commit an injury, as evidenced by external circumstances . . . . 2. *Defamation*. Knowledge (by the person who utters or publishes a defamatory statement) that a statement is false, or reckless disregard about whether the statement is true." Black's Law Dictionary (7th ed), p 968.

3

defamatory statements with "<u>actual malice</u>" in order to prevail in a defamation action. *New York Times*[ *Co v Sullivan*, 376 US 254; 84 S Ct 710; 11 L Ed 2d 686 (1964)] (establishing the "<u>actual malice</u>" standard for liability for defamation of public officials); *Curtis Publishing Co v Butts*, 388 US 130; 87 S Ct 1975; 18 L Ed 2d 1094 (1967) (extending the "<u>actual malice</u>" standard to public figures). "<u>Actual malice</u>" exists when the defendant knowingly makes a false statement or makes a false statement in reckless disregard of the truth. [Emphasis added.]

Further, and as noted earlier, Black's Law Dictionary (7th ed) defines "actual malice" in the context of defamation as "[k]nowledge (by the person who utters or publishes a defamatory statement) that a statement is false, or reckless disregard about whether the statement is true." Accordingly, reference to a legal dictionary and this Court's case law confirms that the term "actual malice" pertains in defamation law. And because the Legislature used the term "malice" in MCL 331.531, not "actual malice," there is no reason to suspect that the Legislature intended principles of defamation law to apply under the peer review statute.

Additionally, interpreting "malice" as "actual malice" in accordance with defamation law would read the term "act" out of MCL 331.531. MCL 331.531 provides that immunity will be provided for "an *act or communication* within its scope as a review entity" as long as the person, organization, or entity does not act with malice. Accordingly, it appears as if the Legislature had a broader understanding of immunity under MCL 331.531 than that contemplated by the majority. In other words, while the defamation definition of "actual malice" might arguably be warranted if MCL 331.531 used that term and the statute dealt only

4

with a communication, the legal definition of "malice" must apply because MCL 331.531 specifically deals with "act[s] or communication[s]."

Further, I am also unpersuaded by the majority's theory that the defamation law definition of "actual malice" must pertain to MCL 331.531 because the Legislature amended the statute to include a malice exception sometime after *New York Times Co v Sullivan*, 376 US 254; 84 S Ct 710; 11 L Ed 2d 686 (1964), was decided. The Legislature added the malice exception roughly 11 years after *Sullivan*, and the majority has not pointed to any other evidence apart from an 11-year gap suggesting that the amendment was a direct response to *Sullivan*, particularly where *Sullivan* uses the term "actual malice" and MCL 331.531 does not. Nor am I persuaded by the majority's rationale that "act," as used in MCL 331.531, must have a "fundamental communicative aspect" and that any act that is "noncommunicative, nonevaluative" is outside the scope of peer review. *Ante* at 26 n 65. There is simply no reason to suspect that the Legislature intended to create such a redundancy in MCL 331.531—i.e., immunity is provided for communicative acts or communications within the scope of peer review. Again, MCL 331.531 provides immunity for "act[s] or communication[s]." Nor am I persuaded by the majority's rationale that the legal meaning of the term "malice" would circumvent the entire peer review process. Rather, a peer review participant is still provided immunity for a nonmalicious "act or communication within its scope as a review entity" as directed by the Legislature.

5

In sum, I agree with the majority's decision to remand this case to the circuit court. On remand, however, I would instead direct the circuit court to apply the legal definition of the term "malice" because there is no indication in MCL 331.531 that the Legislature intended any other meaning.

Michael F. Cavanagh
Elizabeth A. Weaver
Marilyn Kelly