LEE v DETROIT MEDICAL CENTER

Docket No. 282268. Submitted March 10, 2009, at Detroit. Decided July 14, 2009, at 9:10 a.m.

Adriana Lee, as the personal representative of the estate of Rufus Young, Jr., deceased, brought an action in the Wayne Circuit Court against the Detroit Medical Center, Children's Hospital, Drs. Ahm Mahbobul Huq, Jayshree Rao, and Vince Truong, and others, alleging that the defendants breached their statutory duty under MCL 722.623 to report suspected abuse and neglect of the four-year-old decedent. The court, Warfield Moore, Jr., J., granted summary disposition for defendants Detroit Medical Center, Children's Hospital, Huq, Rao, and Truong on the basis that the claims asserted against them were claims for medical malpractice that required the filing of affidavits of merit under MCL 600.2912d and no affidavits had been filed. The court denied summary disposition of the plaintiff's vicarious liability claims against the Detroit Medical Center and Children's Hospital. The plaintiff appealed, and Detroit Medical Center and Children's Hospital cross-appealed.

The Court of Appeals *held*:

1. A two-part test is employed to determine whether a claim sounds in ordinary negligence or medical malpractice. First, whether the claim pertains to an action that occurred within the course of a professional relationship. Second, whether the claim raises questions of medical judgment beyond the realm of common knowledge and experience. If both questions are answered in the affirmative, the action is subject to the procedural and substantive requirements that govern medical malpractice actions. If a jury can evaluate the reasonableness of an action only after the presentation of expert testimony, the claim sounds in medical malpractice.

2. There is no dispute that there was a professional, doctor-patient relationship between the defendant doctors and the decedent.

3. Because MCL 722.623 applies to occupations outside the medical field as well as those within the medical field and requires

all the persons in those occupations to make the same determinations on the basis of the same standard: "reasonable cause to suspect child abuse or neglect," the determination regarding whether there is reasonable cause to suspect abuse or neglect does not require the use of medical judgment. Therefore, the second part of the test cannot be answered in the affirmative and this action does not sound in medical malpractice.

4. An action against a doctor for complying with, or failing to comply with, the Child Protection Law, MCL 722.621 *et seq.*, is entirely separate from an action against that doctor for medical malpractice in treating the child. The trial court erred by granting summary disposition on the basis that the action was a medical malpractice action. The order granting summary disposition must be reversed and the case must be remanded for further proceedings.

5. A well-settled common-law principle such as the doctrine of vicarious liability cannot be abolished by implication. There is no language in MCL 722.633(1), which provides a civil remedy for a violation of MCL 722.623, that expressly abolishes the common-law doctrine of vicarious liability. The trial court did not err by holding that an employer may be held liable for its employee's failure to report under MCL 722.623 and by denying the motion for summary disposition of the vicarious liability claims.

Affirmed in part, reversed in part, and remanded for further proceedings.

O'CONNELL, J., dissenting, stated that although the requirements for reporting suspected abuse under MCL 722.623 might appear to be identical regardless of the profession of the reporting individual, the process that each profession brings to the determination whether a reasonable cause to suspect that child abuse exists is significantly different. Doctors are required to find objective evidence that abuse occurred and cannot simply presume that abuse has occurred. A doctor's act of finding abuse involves medical judgment. The doctor must follow the standard of care for each diagnosis and each patient. For a doctor to presume that abuse is the cause and origin of certain trauma would be a violation of the standard of care. This case clearly is a medical malpractice cause of action because the doctors could not have determined whether the child's injuries were caused by abuse or something else unless they exercised their medical judgment. They are entitled to defend themselves under the proper standard. The claims of ordinary negligence against the doctors and the vicarious liability claims against the corporate defendants premised on the ordinary negligence claims against the doctors should fail. Summary disposition of the vicarious liability claims should have been granted.

1. CHILD ABUSE — CHILD PROTECTION LAW — DUTY TO REPORT SUSPECTED ABUSE.

> The statute that requires certain individuals both inside and outside the medical field who have reasonable cause to suspect child abuse or neglect to immediately report the suspected abuse or neglect does not require such individuals to use medical judgment to determine whether there is reasonable cause to suspect abuse or neglect (MCL 722.623).

2. ACTIONS — CHILD PROTECTION LAW — MEDICAL MALPRACTICE.

> An action against a doctor relating to the duty imposed by the Child Protection Law to report suspected child abuse is entirely separate from an action against the doctor for medical malpractice in treating a child (MCL 722.621 *et seq.*).

3. ACTIONS — CHILD PROTECTION LAW — DUTY TO REPORT SUSPECTED ABUSE — VICARIOUS LIABILITY.

> The Child Protection Law in providing a civil remedy for a violation of the provision of the act that imposes on certain individuals a duty to report suspected child abuse or neglect did not abolish the common-law doctrine of vicarious liability with regard to the employers of the individuals who have the duty to report such abuse or neglect (MCL 722.623, 722.633[1]).

*Fieger, Fieger, Kenney, Johnson & Giroux, P.C.* (by *Geoffrey N. Fieger, Lloyd G. Johnson,* and *Heather A. Jefferson*), for the plaintiff.

*Tanoury, Corbet, Shaw, Nauts & Essad, P.L.L.C.* (by *Linda M. Garbarino* and *Daniel R. Corbet*), for the Detroit Medical Center, Children's Hospital, Dr. Ahm Mahbobul Huq, and Dr. Jayshree Rao.

*Giarmarco, Mullins & Horton, P.C.* (by *LeRoy H. Wulfmeier, III,* and *Jennifer A. Engelhardt*), for Dr. Vince Truong.

Before: WHITBECK, P.J., and O'CONNELL and OWENS, JJ.

OWENS, J. Plaintiff, Adriana Lee, as personal representative of the estate of Rufus Young, Jr., deceased,

appeals as of right the trial court's November 13, 2007, order granting defendants Detroit Medical Center (DMC), Children's Hospital, Dr. Ahm Mahbobul Huq, Dr. Jayshree Rao, and Dr. Vince Truong summary disposition and dismissing plaintiff's statutory liability claims against them without prejudice. Defendants DMC and Children's Hospital cross-appeal, arguing that the trial court erred by denying their motion for summary disposition of plaintiff's vicarious liability claims. We affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

I. FACTS AND PROCEDURAL HISTORY

This case arises from the murder of plaintiff's four-year-old brother, Rufus Young, Jr., while in the care of his foster parents, Tara and Roderick Hall. Rufus Young, Jr., was born on September 28, 1998, to Lynda Lee and Rufus Young, Sr. Lee used crack cocaine and alcohol during her pregnancy, and Rufus Jr. tested positive for cocaine at birth.

After years[1] of involvement by the Family Independence Agency (FIA)[2] and Child Protective Services (CPS), Rufus Jr. and his four siblings were removed from their biological parents in March 2002 because of neglect.[3]

Rufus Jr. and his sister, Junette, were initially placed in the foster home of Sonceria Cooperwood. Cooper-

---

[1] Rufus Jr.'s oldest sibling was removed from her mother's care in the late 1980s because of the mother's substance abuse, and she remained in foster care for five years. Further, the three complaints that ultimately led to removal of the children in 2002 began in 1998.

[2] The agency is now the Department of Human Services.

[3] There was a history of substance abuse by the parents, and the home was found to be without gas service or sufficient beds for Rufus Jr. and his siblings.

wood recalled that Rufus Jr. had urinary problems, eczema,[4] and dental problems while in her care. She also noted that Rufus Jr. had a hearty appetite and that, at night, he would take food from the refrigerator and hide it under his pillow. Cooperwood took Rufus Jr. to the emergency room at Children's Hospital on March 25, 2002, because of a rash on his face and trunk. He was diagnosed with contact dermatitis. On April 3, 2002, Rufus Jr. was examined by Dr. Anthony Clarke, a pediatrician, who also noted that Rufus Jr. had eczema, as well as enuresis,[5] and that he hoarded food and ate until he vomited.

In late April 2002, Cooperwood became unable to care for the children, and they were placed with Tara and Roderick Hall on April 23, 2002. At the time of placement with the Halls, Rufus Jr. was described as "chunky." In subsequent updated services plans, Rufus Jr. was described as "robust . . . [with] an enormously healthy appetite." However, as of January 2003, Rufus Jr.'s weight had dropped to 28 pounds.

On January 2, 2003, Rufus Jr. was taken to his family doctor, Dr. Dennis Treece, because of multiple concerns, including Rufus Jr.'s refusal to toilet train, his inability to gain weight, and his weight loss. Dr. Treece referred Rufus Jr. for a developmental assessment at Children's Hospital for his "failure to thrive."

On February 15, 2003, Drs. Rao and Truong saw Rufus Jr. in the emergency room of Children's Hospital. Dr. Truong, a first-year resident at the time, did the initial physical examination of Rufus Jr. He then advised Dr. Rao of his findings, and she conducted her own

---

[4] Eczema is defined as the "[g]eneric term for inflammatory conditions of the skin . . . ." *Stedman's Medical Dictionary* (26th ed), p 543.

[5] Enuresis is defined as "[u]rinary incontinence; may be intentional or involuntary but not due to a physical disorder." *Id.*, p 579.

physical examination of Rufus Jr. Tara Hall told the doctors that she was there for a second opinion on why Rufus Jr. was not growing and because Rufus Jr. was having tremors. She said that he had a history of tremors and weight loss, and she told the doctors of the upcoming appointment at Children's Hospital regarding his assessment for failure to thrive. Tara Hall also stated that there was a history of physical abuse by the biological parents, as well as drug and alcohol exposure at birth.

In his report, Dr. Truong noted that Rufus Jr.'s skin had "multiple bruising suggesting history of abuse." Dr. Truong testified that he observed both old and new bruises on Rufus Jr. He further noted that Rufus Jr. was withdrawn, underweight, and mildly shaking during the examination. Dr. Truong testified that he did not suspect any abuse by the foster mother because she seemed very concerned, very genuine, and very caring. He did not feel that filing a Form 3200[6] was warranted in this case because the history given by Tara Hall was consistent with his findings, so he had no suspicion of foul play.

Dr. Rao signed off on Dr. Truong's report, stating, "I find the history and physical examination to be consistent with that documented by the resident." However, she testified that the note in Dr. Truong's report, which states that there were bruises, was incorrect. She stated that it should have said marks or scars,[7] not bruises, because there were no bruises on Rufus Jr. And Dr. Rao stated that if there had been bruises on Rufus Jr., she would have contacted the hospital's social worker. Like Dr. Truong, Dr. Rao did not suspect any abuse by the foster mother.

---

[6] Report of Actual or Suspected Child Abuse or Neglect.

[7] Defendants take the position that what Dr. Truong noted in his report as bruises were really eczema scars, which defendants assert can look like bruises.

On February 25, 2003, Rufus Jr. was seen by Dr. Ahm Mahbobul Huq, a neurologist at Children's Hospital. Dr. Huq ordered further testing to determine the reason for Rufus Jr.'s failure to gain weight. Dr. Huq testified that he did not notice any bruises or marks on Rufus Jr. and he had no reason to suspect any past or current abuse or neglect.

Rufus Jr. was again seen by Dr. Treece on March 5, 2003. Dr. Treece referred Rufus Jr. to Dr. Clarke for assistance with Rufus Jr.'s failure to thrive. Dr. Treece did not recall any marks or bruises on Rufus Jr. when he examined him.

On April 5, 2003, Rufus Jr. was left for the day with his foster father, Roderick Hall. Tara Hall returned late in the evening and went to bed. In the early morning of April 6, 2003, Rufus Jr. was found unresponsive in his bedroom. Paramedics were called, and Rufus Jr. was taken to Sinai-Grace Hospital, where he was pronounced dead.

An autopsy was performed, revealing that Rufus Jr. died of cerebral edema that resulted from head trauma. The report noted that Rufus Jr. had suffered 11 blows to the head, as well as numerous blows to his body. His death was deemed a homicide. On April 8, 2003, Roderick Hall confessed. He was convicted of second-degree murder, and he was sentenced to 20 to 40 years in prison.

On December 20, 2004, plaintiff filed suit against defendants, alleging that defendants breached their statutory duty to report suspected child abuse and neglect under MCL 722.623 and 722.633.[8] On July 3,

---

[8] The case was removed to federal court. However, plaintiff dismissed the social worker defendants, and the case was remanded to the Wayne Circuit Court. Further, a settlement was reached between plaintiff and defendants Life Span Clinical Services and Kristin Ryeson Dzahristos in June 2007.

2007, defendants Dr. Rao, Dr. Huq, DMC, and Children's Hospital moved for summary disposition under MCR 2.116(C)(7), (8), and (10), asserting that they were entitled to dismissal of plaintiff's statutory claims because they were really claims for medical malpractice, requiring the filing of affidavits of merit under MCL 600.2912d. Dr. Truong concurred in this motion on July 6, 2007.

Dr. Huq filed a separate motion for summary disposition under MCR 2.116(C)(10), asserting that he was entitled to summary disposition because plaintiff's experts testified that he was not required to file a report of suspected child abuse or neglect.

Additionally, defendants DMC and Children's Hospital also moved for summary disposition under MCR 2.116(C)(7) and (8), arguing that they were entitled to dismissal of plaintiff's vicarious liability claims because MCL 722.633 does not provide for liability for anyone other than the person who fails to report. Plaintiff opposed defendants' motions.

The trial court entered an order on November 13, 2007, dismissing without prejudice plaintiff's statutory liability claims against defendants Dr. Rao, Dr. Huq, Dr. Truong, DMC, and Children's Hospital and denying defendants DMC and Children's Hospital's motion to dismiss plaintiff's vicarious liability claims. This appeal and cross-appeal followed.

## II. STATUTORY CLAIM FOR DAMAGES

Plaintiff argues that the trial court erred by dismissing plaintiff's claims against defendants for breach of their statutory reporting duties. We agree.

This Court reviews a trial court's decision on a motion for summary disposition de novo. *Feyz v Mercy*

*Mem Hosp*, 475 Mich 663, 672; 719 NW2d 1 (2006). "A motion for summary disposition brought [under] MCR 2.116(C)(8) tests the legal sufficiency of the complaint on the allegations of the pleadings alone." *Id.* A motion for summary disposition under MCR 2.116(C)(10) tests the factual sufficiency of the complaint. *Corley v Detroit Bd of Ed*, 470 Mich 274, 278; 681 NW2d 342 (2004). When reviewing a motion for summary disposition under MCR 2.116(C)(10), this Court must consider the pleadings, affidavits, depositions, admissions, and other documentary evidence submitted in the light most favorable to the nonmoving party. *Corley, supra* at 278.[9]

Plaintiff's claim is based on defendants' failure to report suspected abuse and neglect under MCL 722.623, which provides, in pertinent part, as follows:

> (1) An individual is required to report under this act as follows:
>
> (a) A physician, dentist, physician's assistant, registered dental hygienist, medical examiner, nurse, person licensed to provide emergency medical care, audiologist, psychologist, marriage and family therapist, licensed professional counselor, social worker, licensed master's social worker, licensed bachelor's social worker, registered social service technician, social service technician, a person employed in a professional capacity in any office of the friend of the court, school administrator, school counselor or teacher, law enforcement officer, member of the clergy, or regulated child care provider who has reasonable cause to suspect child abuse or neglect shall make immediately, by tele-

---

[9] Defendants' motion was brought under both MCR 2.116(C)(8) and (10), and the trial court did not specifically note under which section it was granting the motion. However, it appears that the motion was granted under MCR 2.116(C)(10) because the trial court relied on discovery depositions to make its decision. *Driver v Hanley (After Remand)*, 226 Mich App 558, 562; 575 NW2d 31 (1997) (construing a motion as having been granted under MCR 2.116(C)(10) because the trial court relied on matters outside the pleadings).

phone or otherwise, an oral report, or cause an oral report
to be made, of the suspected child abuse or neglect to the
department.

MCL 722.622 defines child abuse and child neglect as
follows:

(f) "Child abuse" means harm or threatened harm to a
child's health or welfare that occurs through nonaccidental
physical or mental injury, sexual abuse, sexual exploitation,
or maltreatment, by a parent, a legal guardian, or any
other person responsible for the child's health or welfare or
by a teacher, a teacher's aide, or a member of the clergy.

\* \* \*

(j) "Child neglect" means harm or threatened harm to a
child's health or welfare by a parent, legal guardian, or any
other person responsible for the child's health or welfare
that occurs through either of the following:

(*i*) Negligent treatment, including the failure to provide
adequate food, clothing, shelter, or medical care.

(*ii*) Placing a child at an unreasonable risk to the child's
health or welfare by failure of the parent, legal guardian, or
other person responsible for the child's health or welfare to
intervene to eliminate that risk when that person is able to
do so and has, or should have, knowledge of the risk.

MCL 722.633 sets forth the liability for failure to
report:

(1) A person who is required by this act to report an
instance of suspected child abuse or neglect and who fails
to do so is civilly liable for the damages proximately caused
by the failure.

(2) A person who is required by this act to report an
instance of suspected child abuse or neglect and who
knowingly fails to do so is guilty of a misdemeanor punish-
able by imprisonment for not more than 93 days or a fine of
not more than $500.00, or both.

Defendants assert that because the alleged failure to report occurred during medical treatment and required the use of defendants' medical judgment, it is a medical malpractice claim, not an ordinary negligence claim. We disagree.

"The gravamen of an action is determined by reading the claim as a whole." *Simmons v Apex Drug Stores, Inc*, 201 Mich App 250, 253; 506 NW2d 562 (1993). Further, our Supreme Court has articulated a two-part test to determine whether a claim sounds in ordinary negligence or medical malpractice. *Kuznar v Raksha Corp*, 481 Mich 169, 176-177; 750 NW2d 121 (2008), citing *Bryant v Oakpointe Villa Nursing Ctr, Inc*, 471 Mich 411, 422; 684 NW2d 864 (2004).

> A medical malpractice claim is distinguished by two defining characteristics. First, medical malpractice can occur only " 'within the course of a professional relationship.' " Second, claims of medical malpractice necessarily "raise questions involving medical judgment." Claims of ordinary negligence, by contrast, "raise issues that are within the common knowledge and experience of the [factfinder]." Therefore, a court must ask two fundamental questions in determining whether a claim sounds in ordinary negligence or medical malpractice: (1) whether the claim pertains to an action that occurred within the course of a professional relationship; and (2) whether the claim raises questions of medical judgment beyond the realm of common knowledge and experience. If both these questions are answered in the affirmative, the action is subject to the procedural and substantive requirements that govern medical malpractice actions. [*Bryant, supra* at 422 (citations omitted).]

In other words, if a jury can evaluate the reasonableness of an action only after the presentation of expert testimony, the claim sounds in medical malpractice. *Id.* at 423; see also *Dorris v Detroit Osteopathic Hosp Corp*, 460 Mich 26, 46; 594 NW2d 455 (1999).

There is no dispute in this case that there was a professional, doctor-patient relationship between the defendant doctors and Rufus Jr. See *Dyer v Trachtman*, 470 Mich 45, 50; 679 NW2d 311 (2004). Therefore, this case turns on the medical-judgment prong of the *Bryant* test.

Defendants contend that the determination regarding whether there is "reasonable cause to suspect abuse" requires the use of medical judgment. However, the plain language of the statute contradicts defendants' argument. The statute expressly states that it applies to more than just medical doctors. Indeed, it applies to several occupations outside the medical field, e.g., social workers, any person employed in a professional capacity by any office of the friend of the court, school counselors and administrators, teachers, members of the clergy, and regulated child care providers. These persons do not have any medical education or training, and yet they also are mandated by statute to make the same determination on the basis of the same standard: "reasonable cause to suspect child abuse or neglect." Therefore, because the same standard is applied to individuals outside the medical field, the determination regarding whether there is reasonable cause to suspect abuse or neglect does not require the use of medical judgment.

Further, this Court has held that a person required to report under MCL 722.623 is not free to arrogate to himself the right to foreclose the possibility of a legal investigation by the state. *People v Cavaiani*, 172 Mich App 706, 715; 432 NW2d 409 (1988). Indeed, in *Cavaiani*, the defendant, a psychologist and family therapist, was told by his nine-year-old client that her father fondled her breasts. However, the defendant did not report the abuse because he was convinced, after talking with the father,

that if there was any touching, it was accidental and not for sexual arousal or gratification. The defendant was charged with a misdemeanor under MCL 722.633 for failing to report the abuse. The trial court dismissed the charge against the defendant, reasoning that the defendant may have concluded, on the basis of his professional judgment, that the information supplied to him was inaccurate or a fantasy. This Court rejected the trial court's reasoning, concluding that even if the defendant personally believed that there was no child abuse, he was still required to report the possibility and allow the state to investigate because the state has different interests. *Cavaiani, supra* at 715.

Likewise, in *Williams v Coleman*, 194 Mich App 606, 616-617; 488 NW2d 464 (1992), this Court rejected the defendant social workers' argument that the decision to report involves significant decision making to assess the reasonableness and dependability of information, noting that *Cavaiani* refuted such an approach. Therefore, doctors are left with little, if any, discretion in reporting. Rather, MCL 722.623 (1)(a) provides that if there is any *"reasonable cause to suspect"* [emphasis added] abuse or neglect, the doctor must report it immediately and let CPS investigate the case to determine the validity of the information provided.[10]

We also note that the Child Protection Law, MCL 722.621 *et seq.*, contains civil and criminal liability provisions (MCL 722.633), as well as an immunity provision (MCL 722.625). The provisions apply to mandated reporters as follows: (1) a person who knowingly fails to report when required to do so incurs criminal

---

[10] A diagnosis of abuse or neglect is not required by the statute; a reasonable suspicion that the child has suffered abuse or neglect is sufficient to trigger the reporting requirement.

liability; (2) a person who fails to report when required
to do so incurs civil liability; (3) a person who reports in
good faith is immune from any civil or criminal liability
that might otherwise be incurred as a result of that
action.

MCL 722.625 then clarifies that the grant of immu-
nity applies only to acts required by the Child Protec-
tion Law:

> [T]his immunity from civil or criminal liability extends
> only to acts done according to this act [reporting, cooper-
> ating, or assisting as required by the act] and does not
> extend to a negligent act that causes personal injury or
> death or to the malpractice of a physician that results in
> personal injury or death.

Therefore, it is clear that an action against a doctor
for complying with, or failing to comply with, the act
is entirely separate from an action against that doctor
for medical malpractice in treating the child. For
example: a doctor suspects abuse because of broken
bones and files a report under this act. In actuality,
the child was not abused but suffers from brittle bone
disease. As a result of the doctor's failure to diagnose
brittle bone disease, the child's condition goes un-
treated and the child suffers further fractures. If the
doctor were sued for wrongful reporting, the doctor
would have statutory immunity from civil liability.
However, if the doctor were sued for medical malprac-
tice for failure to correctly diagnose and treat the
child's condition, the immunity provisions of the act
would not protect the doctor. See *Awkerman v Tri-
County Orthopedic Group, PC*, 143 Mich App 722; 373
NW2d 204 (1985).

Thus, the trial court erred by granting summary
disposition in this matter.

### III. VICARIOUS LIABILITY

Defendants argue that the trial court erred by denying defendants DMC and Children's Hospital's motion for summary disposition with regard to plaintiff's vicarious liability claims. We disagree.

Again, this Court reviews de novo a trial court's decision on a motion for summary disposition. *Feyz, supra* at 672. Likewise, statutory interpretation is a question of law that this Court also reviews de novo. *Reed v Yackell*, 473 Mich 520, 528; 703 NW2d 1 (2005).

"Vicarious liability is indirect responsibility imposed by operation of law." *Theophelis v Lansing Gen Hosp*, 430 Mich 473, 483; 424 NW2d 478 (1988). It is " 'based on a relationship between the parties, irrespective of participation, either by act or omission, of the one vicariously liable, under which it has been determined as a matter of policy that one person should be liable for the act of the other.' " *Id.* (citations omitted). Accordingly, " 'a master is responsible for the wrongful acts of his servant committed while performing some duty within the scope of his employment.' " *Rogers v J B Hunt Transport, Inc*, 466 Mich 645, 651; 649 NW2d 23 (2002), quoting *Murphy v Kuhartz*, 244 Mich 54, 56; 221 NW 143 (1928).

Here, the trial court denied defendants' motion for summary disposition regarding plaintiff's vicarious liability claim. Defendants DMC and Children's Hospital challenge that ruling on appeal, arguing that there is no vicarious liability in this case under the plain language of MCL 722.633(1).

The goal of statutory construction is to discern and give effect to the intent of the Legislature. *Neal v Wilkes*, 470 Mich 661, 665; 685 NW2d 648 (2004). This Court must ascertain the legislative intent that may be inferred from

the words of the statute. *Koontz v Ameritech Services, Inc*, 466 Mich 304, 312; 645 NW2d 34 (2002). "When the Legislature has unambiguously conveyed its intent in a statute, the statute speaks for itself, and judicial construction is not permitted." *Id.* " 'Statutory language should be construed reasonably, keeping in mind the purpose of the act.' " *Twentieth Century Fox Home Entertainment, Inc v Dep't of Treasury*, 270 Mich App 539, 544; 716 NW2d 598 (2006) (citation omitted).

Generally, when a statute provides new rights and remedies, those remedies are exclusive. *South Haven v Van Buren Co Bd of Comm'rs*, 478 Mich 518, 529; 734 NW2d 533 (2007). However, statutes in derogation of the common law are narrowly construed. *Rusinek v Schultz, Snyder & Steele Lumber Co*, 411 Mich 502, 507-508; 309 NW2d 163 (1981). And well-settled common-law principles are not to be abolished by implication. *Walters v Leech*, 279 Mich App 707, 710; 761 NW2d 143 (2008).

MCL 722.633(1) provides the following civil remedy for violation of MCL 722.623:

> A person who is required by this act to report an instance of suspected child abuse or neglect and who fails to do so is civilly liable for the damages proximately caused by the failure.

Defendants argue that the plain language of MCL 722.633 limits liability to individual liability only. However, a well-settled common-law principle, such as the doctrine of vicarious liability, cannot be abolished by implication. And there is no language in the statute that expressly abolishes the doctrine.

Although governing a different subject matter entirely, the Michigan no-fault automobile insurance act, MCL 500.3101 *et seq.*, has been the basis for several decisions that provide us guidance in this

matter. In each of the following cases the enactment of the law did not extinguish common-law doctrines that existed before the enactment of the no-fault act. In *Adams v Auto Club Ins Ass'n*, 154 Mich App 186, 194-195; 397 NW2d 262 (1986), the plaintiff argued that because there is no section of the no-fault act that entitles insurers to maintain actions against insureds to recover overpaid work-loss benefits unless duplicate payment is received from a collateral source, the defendant was not entitled to reimbursement for any overpayments made to the plaintiff. The *Adams* Court disagreed and held that the enactment of the no-fault act did not extinguish common-law doctrines predating that legislation, specifically that the common-law rule permitting recoupment of payments was not abolished by the no-fault act. In *Bak v Citizens Ins Co of America*, 199 Mich App 730, 737-738; 503 NW2d 94 (1993), this Court concluded that because the no-fault act did not specifically abrogate the common-law principle of mitigation of damages, the defense remains available. See also *Struble v Detroit Automobile Inter-Ins Exch*, 86 Mich App 245, 250; 272 NW2d 617 (1978) (common-law tort rule "should not be considered as abrogated unless there is a clear intent to do so," citing 73 Am Jur 2d, Statutes, § 181, p 384); *Rusinek, supra* at 508 (no-fault act did not abolish common-law actions for loss of consortium). A statute must not be construed to abrogate established common-law principles by implication. *Id.* at 507-508. Thus, we have a line of Michigan cases that all conclude that the common law should not be abrogated by statute unless it clearly appears that was the legislative intent.

Here, there is no indication that the Legislature intended to abrogate the common-law doctrine of vicarious liability. The preamble to the Child Protection Law

states that its purpose is, in part, "to provide for the protection of children who are abused and neglected . . . ." Allowing entities such as hospitals to be the subject of vicarious liability would further the stated goal of protecting children from abuse and neglect by encouraging appropriate supervision and training of mandated reporters and by encouraging organization-wide policies that comport with Michigan law.

We conclude that an employer may be held liable for its employee's failure to report under MCL 722.623 and that the trial court did not err by denying defendants' motion for summary disposition of plaintiff's vicarious liability claims.

The dissent argues that today's decision "handicaps the doctors of this state" and "strips doctors of the protections inherent in a medical malpractice cause of action." To the contrary, our decision requires nothing more of doctors than the plain language of the statute has always required of them: to report when they reasonably suspect that a child has been abused or neglected as defined by the statute. Neither the statute nor precedentially binding appellate caselaw has ever provided that a doctor could only be sued for medical malpractice rather than for ordinary negligence for failure to report reasonably suspected abuse or neglect. Therefore, our decision does not take something from doctors that they possessed heretofore. In fact, we merely hold that doctors are held to the same standard as every other similarly situated person, that is, all of the other statutorily mandated reporters.

In enacting the statute, the Legislature knowingly included many occupations that regularly come in contact with children, such as teachers, school counselors, social workers, child care providers, physicians, den-

tists, nurses, and psychologists, among others, and required all of them to report on the same basis: if there is a reasonable cause to suspect child abuse or neglect. The Legislature could have provided different standards for reporting based on the differing knowledge and experience of those mandated to report, but it did not do so. We cannot read different standards into the act. "It is axiomatic that when the language of an act clearly enunciates a standard . . . it is repugnant to attempt to judicially read into the act other requirements or conditions that operate to defeat or limit its aim." *Kidd v Gen Motors Corp*, 414 Mich 578, 588; 327 NW2d 265 (1982).

The dissent alarmingly speculates that doctors will now "report all incidents involving a bump or a bruise" in order to protect themselves from "frivolous lawsuits." This fear is belied by the words of the statute: it does not require every bump or bruise on a child be reported. Only those injuries that raise a reasonable suspicion of child abuse or neglect must be reported. Most bumps and bruises are accidentally sustained in the course of a child's play. However, some injuries are not innocently acquired. Some injuries, by their very nature, raise a reasonable suspicion of child abuse: facial bruises in the shape of the fingers of an adult hand, bruises to the back, buttocks, or legs in the shape of a looped electrical cord, rope burns to the wrists and ankles, a burn in the shape of an iron on a child's back. Other injuries may not be suspicious by themselves, but may become reasonably suspicious because the explanation given does not match the injury: it could not have occurred in the manner given, or because the explanations given upon questioning change over time.

If a child is presented to a doctor with an inherently nonsuspicious injury, the caregiver's explanation is in-

nocent, consistent, and reasonably explains the injury, and there are no other indicia of child abuse or neglect present, the doctor would not reasonably suspect child abuse or neglect and would not be under a duty to report. However, if a doctor reasonably suspected child abuse or neglect, that doctor would be statutorily required to report. As with all other mandated reports, the failure to report when required to do so would be judged under an ordinary negligence standard.

Affirmed in part, reversed in part, and remanded for proceedings consistent with this opinion. We do not retain jurisdiction.

WHITBECK, P.J., concurred.

O'CONNELL, J. (*dissenting*). I respectfully dissent. Although I appreciate the altruistic nature and concern for children's health and welfare that the majority displays in its opinion, the unintended consequences of the majority's opinion are untenable. The majority opinion creates a scenario that, in effect, requires doctors to report to the Department of Human Services (DHS) all injuries to any children in their care if there exists "reasonable cause to suspect abuse" according to an abstract, nonspecific standard, even if their medical judgment leads them to believe otherwise. The majority strips doctors of the protections inherent in a medical-malpractice cause of action, which would hold a doctor to the standard of care in his profession when determining whether a "reasonable cause to suspect abuse" exists. By declaring that a doctor's failure to report suspected abuse sounds in ordinary negligence and not in medical malpractice, the majority essentially handicaps the doctors of this state, requiring them to report any circumstance in which a child in a doctor's care is discovered to have a bump or bruise that a layperson

might find indicative of abuse, even if, upon exami-
nation, the doctor makes a medical determination
that the injury is not a sign of abuse. When a doctor
acting in his professional capacity, as has occurred in
this case, has "reasonable cause to suspect child
abuse," this suspicion necessarily arises from the
doctor's professional *medical* determination that
child abuse might have occurred. Accordingly, plain-
tiff's cause of action against Drs. Rao and Truong
sounds in medical malpractice, not in negligence.[1]

### THE ROLE OF DOCTORS IN OUR SOCIETY
### (FINDING ABUSE VERSUS PRESUMING ABUSE)

The majority opinion fails to take into account the
obvious—that there exists a significant difference be-
tween the role of doctors in our society and the role of
other professionals in society. Doctors are required to
*find* objective evidence that abuse has occurred—that is
their charge or role in our society. Doctors search for
and find the cause and origin of medical issues in their
patients. They cannot simply *presume* that abuse has
occurred. Finding abuse requires medical judgment on
the part of the doctor. Unlike in other professions, in
the medical profession there exists a standard of care
for each diagnosis and each patient. For a doctor to
*presume* that abuse is the cause and origin of certain

---

[1] The majority essentially asserts that in the setting of a doctor's
office or hospital emergency room, "reasonable cause to suspect
abuse" does not require the use of medical judgment and, therefore, an
action can be filed against the doctor for ordinary negligence. After the
majority opinion in this case is released, I suspect that in order to
avoid frivolous lawsuits for failure to report incidents under the
statute, doctors will report all incidents involving a bump or bruise to
the DHS, and the DHS will then be required to investigate all these
claims.

trauma would be a violation of the standard of care owed to that patient and to society in general.[2]

Other professions, such as teachers and others named in the statute, upon observation of a student, or for that matter a report by a student, are entitled, without violating a standard of care, to presume abuse and are required to report that which they presume occurred. There exists no professional medical judgment involved in this process. Stated another way, one profession *presumes* abuse, the other is required to *find* objective evidence of abuse. In my opinion, to conflate the role of one profession within our society with that of another is simply a failure to comprehend the synergetic relationships of each part of our society. The majority implies that because doctors have immunity for all false reporting claims, they are relieved of the duty of *finding* objective evidence of abuse and therefore are simply held to a layperson's standard of *presuming* abuse and reporting it. I suspect that most medical schools and most doctors will be interested in

---

[2] I concur with the majority opinion to the extent that if a patient walks into a doctor's office or an emergency room and reports that her boyfriend, stepfather, relative, or other person has been abusing a child, then, under those specific facts, the doctor is not required to find abuse and no medical judgment is involved.

The majority cites only two cases to support its position that "reasonable cause to suspect abuse" does not require medical judgment, *People v Cavaiani*, 172 Mich App 706, 715; 432 NW2d 409 (1988), and *Williams v Coleman*, 194 Mich App 606, 616-617; 488 NW2d 464 (1992). However, both cases are distinguishable from the present case. I note that *Cavaiani* is a criminal case, not a civil negligence case and therefore is of little assistance in the present case. More importantly, in *Cavaiani* the defendant, a psychologist and family therapist, was told by his nine-year-old client that her father had fondled her breasts. As noted above, under this set of facts, the psychologist was not required to *find* objective evidence of abuse and no medical judgment is involved. In *Williams*, the defendants were social workers, not doctors, and therefore that case is of less assistance to the present case than *Cavaiani*.

this new presumed abuse standard. Fortunately, I am of the opinion that doctors must *find* objective evidence that abuse has occurred, and the act of *finding* abuse, in my opinion, involves medical judgment.

DISCUSSION OF THE CASE

Plaintiff's claims against Dr. Rao and Dr. Truong arise from their February 15, 2003, emergency room examinations of Rufus Young, Jr. Tara Hall, Rufus's foster mother, advised the doctors that Rufus had been exposed to drugs and alcohol before his birth and that his biological parents had physically abused him. Hall advised the doctors that Rufus had multiple problems, including a refusal to toilet train, an inability to gain weight, and a history of tremors and weight loss, and she advised them of an upcoming medical appointment to address Rufus's failure to thrive. Drs. Truong and Rao then examined Rufus and concluded, in their professional opinions, that there was no reason to suspect current abuse.

As the majority notes, there is no dispute in this case that there was a professional doctor-patient relationship between the doctors and Rufus, so this case turns on the medical judgment prong of the *Bryant* test, which is set forth in the majority opinion. *Bryant v Oakpointe Villa Nursing Ctr, Inc*, 471 Mich 411, 422; 684 NW2d 864 (2004). In this case, both Dr. Rao and Dr. Truong testified that they did not have reasonable cause to suspect abuse. Dr. Rao's original report noted that the diagnosis by Dr. Truong, a first-year resident at the time, was incorrect; Dr. Truong's report should have said that there were marks or scars on Rufus, not bruises. Dr. Rao also testified that if there had been bruises, she would have notified the social worker. Further, defendants noted that Rufus had a history of

eczema and that a first-year resident could easily mistake eczema scars for marks caused by abuse.

In light of these facts, the doctors' failure to report illustrates my point: the doctors used their medical judgment to identify Rufus's symptoms and determine whether they were indicative of abuse. Drs. Rao and Truong made medical determinations on the basis of their different levels of expertise to determine whether the marks on Rufus's skin were scars or bruises, and whether they were caused by eczema or abuse. These questions can only be answered after some application of medical knowledge or expertise—an individual cannot tell the difference between eczema and bruising, for example, without first learning how eczema and bruising form and how they appear on the skin during different stages of development and healing. Further, a first-year resident likely would not exhibit the same level of expertise as the attending physician in making this determination. Accordingly, a determination regarding whether marks on a child's body indicate abuse or are the result of some other medical condition constitutes a "medical judgment beyond the realm of common knowledge and experience," which is indicative of a cause of action for medical malpractice, not negligence.

The majority determines that because MCL 722.623 applies to several occupations outside the medical field, the cause of action against the individual doctors necessarily rests in ordinary negligence, not medical malpractice. Yet this is an overly simplistic reading of the statute. True, the statute mandates that teachers, child care providers, and others employed outside the medical field are also obligated to report child abuse if they have reasonable cause to suspect it. However, the majority fails to recognize that the capacity of an individual to have "reasonable cause to suspect child abuse" depends

in large part on whether that individual is a physician, a counselor, a social worker, a teacher, or a member of one of the other listed professions.

For example, a teacher might conclude that a student who arrives in school with strange discolorations on his arms and face might have been bruised and, given this observation, she might have reasonable cause to believe that the student had been abused. Therefore, she would be required to report under the statute. Conversely, a doctor examining the discolorations on this child might determine that these same discolorations were not bruises, but flare-ups of eczema. Although a layperson might think that these discolorations were signs of abuse, the doctor, *through the exercise of his medical judgment,* would not have reasonable cause to believe that this child had been abused. Although the teacher's lack of medical expertise would render her suspicion of abuse or neglect reasonable, a doctor's exercise of his medical judgment could indicate that he did not have reasonable cause to suspect that a suspicious discoloration on the child's skin was indicative of abuse or neglect. When a physician acts in his professional capacity, his determination that he has reasonable cause to suspect child abuse or neglect necessarily arises from the exercise of his medical judgment; by extension, so does any failure to recognize such abuse or neglect[3]. This is not an ordinary negligence situation—a

---

[3] When addressing the question whether, in the setting of a hospital emergency room, "reasonable cause to suspect abuse" requires the use of medical judgment, the trial court answered in the affirmative, plaintiff's experts answered in the affirmative, and the individual defendants answered in the affirmative. Needless to say, I concur with the determination of defendants, plaintiff's experts, and the trial court.

In particular, I note that plaintiff's expert witnesses, Dr. Roy Antelyes and Dr. Robert Lerer, noted that in the setting of a hospital emergency

layperson cannot judge whether the doctor's actions

room or a doctor's office, a doctor's medical judgment is essential to determine if there is a "reasonable suspicion of abuse." Dr. Antelyes testified as follows:

> *Q.* And how does the physician go about coming up with a suspicion of abuse?

> *A.* Well, part of that has to do with your *education and experience*. Part of it has to do with the *historical data* that you have obtained from somebody who brought it to your attention. Part of it is your *physical examination and/or laboratory testing*. And I think I probably covered pretty much all of it. [Emphasis added.]

Dr. Robert Lerer testified:

> *Q.* On February 15th, 2003, do you know if any of those bruises or marks on his body were fresh versus old?

> *A.* No.

* * *

> *Q. Now every patient in the Children's Hospital emergency department that shows up with bruises, you don't automatically file a suspected child abuse form, do you?*

> *A. No, no.* I don't think so, and, you know, I've worked in the emergency room at various times in my career, although it's been more than fifteen years since I worked in the ER seeing patients, but the patients present to your office just like they do in the emergency department with bruises and so forth.

> *Not every child that has bruises has been abused.* Children fall, sometimes children injure themselves in the course of play activities. Sometimes children, you know, fight and may be bruised in that particular fashion. So accidental injuries of any sort caused by whatever can produce bruises.

> *Q.* How does the physician in the emergency department or in the office . . . determine whether or not the bruises are the type that should be reported to Protective Services?

> *A.* First of all, *the history is very important.* If I have—and I'll give you some for instances to explain each point.

> *The history is very important. If you have a history of an event occurring and the bruise or bruises do not match the event*, then

were negligent in the way that he could judge the teacher's, because unlike the teacher, the doctor's determination whether abuse did or did not occur would arise from his understanding of the science behind the

---

you immediately become suspicious that you're not getting a true picture and, therefore, child abuse becomes prominent in your *differential diagnosis,* so that would be number one.

*Number two, I think you tend to see what the social situation is like.* Now, I have seen children bruised, indeed, I had one patient fatality where both parents were physicians, so I'm not implying that if you're in a low socioeconomic home, that you are more likely to be necessarily abused than if you come from a higher class family, but nevertheless, if you are in a chaotic home situation, if you have a single parent with a boyfriend in the home, then you become more suspicious in situations where you're thinking is this abuse or is this an accidental type of injury.

I think associated findings are also important, in my estimation. This child had one very important finding, and that is that from the time that he was placed in the foster home, he actually dropped weight.

\* \* \*

A. *I don't think I can look at the pictures and exclude the possibility that some old eczema that is now healed has produced some hyperpigmented areas.*

\* \* \*

A. *If the bruises have the appearance of being three months or older to the examining physician and some history is obtained by the examining physician that the biological family, known to be abusive or neglectful or both, did them and there's no further history elicited that the child currently is in an abusive foster home, then the physician might be justified under such circumstances as to not contact Protective Services under such a hypothetical.* [Emphasis added.]

This testimony indicates that a physician's determination of abuse is subjective, involving clinical findings and medical judgment. As such, it is beyond the common expertise of an ordinary person and requires medical testing to substantiate. Therefore, the cause of action is for medical malpractice, not ordinary negligence.

symptoms. An expert would be needed to explain how abuse could be recognized through a medical examination and whether a doctor's diagnosis or failure to recognize abuse comported with the standard of care. Therefore, any potential error in judgment on the part of a doctor in such a scenario sounds not in ordinary negligence, but in medical malpractice.

Although on the surface, the requirements of reporting suspected abuse under MCL 722.623 might appear to be identical regardless of the profession of the reporting individual, the process that each profession brings to the determination whether a reasonable cause to suspect that child abuse exists is significantly different. Conversely, the majority lays all its eggs in one basket: under the majority's theory, if a layperson can be sued for ordinary negligence for committing a certain act, then a doctor can be sued for ordinary negligence for committing the same act. This clearly defies the intent behind the medical malpractice cause of action, which establishes a process that is distinct from an ordinary negligence claim to bringing a cause of action against doctors for errors committed during the doctor-patient relationship, because such errors are often based on medical judgments beyond the realm of common knowledge and experience and require the introduction of expert testimony to ensure proper disposition of the claim.

In my opinion, this is clearly a medical malpractice cause of action because these doctors could not have determined whether Rufus's injuries were caused by abuse or something else unless they exercised their medical judgment. Therefore, they are entitled to defend themselves under the proper standard. Because plaintiff's claims of ordinary negligence against Drs. Rao and Truong should fail, her vicarious liability claims against the corporate defendants, which

are premised on the ordinary negligence claims against the individual doctors, should fail as well.

The motion for summary disposition should have been granted. I would reverse and remand for proceedings consistent with this opinion.