# STATE OF MICHIGAN

# COURT OF APPEALS

MARK RASAK, DO,

Plaintiff-Appellant,

v

BOTSFORD GENERAL HOSPITAL,

Defendant-Appellee.

UNPUBLISHED
September 25, 2018

No. 339614
Oakland Circuit Court
LC No. 2015-150796-CZ

Before: M. J. KELLY, P.J., and MARKEY and FORT HOOD, JJ.

PER CURIAM.

Plaintiff, a cardiologist, filed this action against defendant, Botsford General Hospital, after it refused to renew plaintiff's medical staff privileges at the hospital. Plaintiff now appeals by right, challenging the trial court's decisions granting defendant summary disposition of plaintiff's claims, as well as other preliminary decisions in the action. We affirm.

Plaintiff first argues that the trial court erred when it denied plaintiff's motion for discovery of materials related to defendant's internal decision-making process, including the rationale for its decision not to renew plaintiff's privileges. Plaintiff acknowledges that some of the material is protected peer-review material, but he argues that defendant's invocation of the peer-review privilege to bar plaintiff's requested discovery was overbroad. "Whether production of the documents at issue is barred by statute is a question of law that we review de novo." *Dye v St John Hosp & Med Ctr*, 230 Mich App 661, 665; 584 NW2d 747 (1998).

The Michigan Public Health Code requires hospitals to have procedures to review physicians' professional practices. MCL 333.21513 imposes the following duties on the owner, operator, and governing body of a licensed hospital:

> (c) Shall assure that physicians and dentists admitted to practice in the hospital are granted hospital privileges consistent with their individual training, experience, and other qualifications.

> (d) Shall assure that physicians and dentists admitted to practice in the hospital are organized into a medical staff to enable an effective review of the professional practices in the hospital for the purpose of reducing morbidity and mortality and improving the care provided in the hospital for patients. The review

-1-

shall include the quality and necessity of the care provided and the preventability of complications and deaths occurring in the hospital.

Three statutes render the review process confidential and not subject to discovery in litigation. The first, MCL 331.533, states that "[e]xcept [for certain purposes stated in MCL 331.532], the record of a proceeding and the reports, findings, and conclusions of a review entity and data collected by or for a review entity under this act are confidential, are not public records, and are not discoverable and shall not be used as evidence in a civil action or administrative proceeding." The second statute states that "[t]he records, data, and knowledge collected for or by individuals or committees assigned a professional review function in a health facility or agency. . . are confidential, shall be used only for the purposes provided in this article, are not public records, and are not subject to court subpoena." MCL 333.20175(8). Similarly, MCL 333.21515 states that "[th]e records, data, and knowledge collected for or by individuals or committees assigned a review function described in this article are confidential and shall be used only for the purposes provided in this article, shall not be public records, and shall not be available for court subpoena."

In *Johnson v Detroit Med Ctr,* 291 Mich App 165, 168; 804 NW2d 754 (2010), this Court stated:

> Our Supreme Court has recognized that, under § 21513, "[h]ospitals are required to establish peer review committees whose purposes are to reduce morbidity and mortality and to ensure quality of care." See *Attorney General v Bruce*, 422 Mich 157, 169, 369 NW2d 826 (1985). "Included in their duties is the obligation to review the professional practices of licensees, granting staff privileges consistent with each licensee's qualifications." *Id.*; see, also, *Dye*, 230 Mich App [661, 664-665, 584 NW2d 747 (1998)]. Thus, a credentialing committee is a peer review committee.

Although plaintiff appears to acknowledge that the peer-review privilege applies to the information concerning his patient care, he maintains that the privilege does not cover the other information he sought regarding alleged misrepresentations on his application concerning whether his privileges at another hospital had been suspended and whether he had allowed one of his board certifications to lapse. He relies on our Supreme Court's decision in *Krusac v Covenant Med Ctr, Inc,* 497 Mich 251, 262; 865 NW2d 908 (2015), in which the Court held that the privilege is limited to records, data, and knowledge "for the purpose of reducing morbidity and mortality and improving the care provided in the hospital for patients" under MCL 333.21513(d). *Krusac,* however, did not define the scope of this limitation. In this case, any information pertaining to plaintiff's suspension at the other hospital easily falls within this scope, particularly because it related to plaintiff's alleged misconduct surrounding his patient care and refusal to abide by imposed limitations at that hospital. We also agree that information concerning board certifications, or the lack thereof, is reasonably related to patient care.

We reject plaintiff's argument that defendant "waived" the privilege against disclosure through the use of deposition testimony or other materials. Although the restriction on use of peer-review materials is termed a "privilege," the language of MCL 333.20175(5) does not create a personal privilege, such as a physician-patient privilege that may be waived by a patient.

-2-

See *Meier v Awaad*, 299 Mich App 655, 666; 832 NW2d 251 (2013) (discussing the scope of the physician-patient privilege). Rather, the clear language of this provision establishes a blanket prohibition on the outside use of this information. See *Feyz v Mercy Mem Hosp*, 475 Mich 663, 685; 719 NW2d 1 (2006) ("[T]he peer review statutory regime protects peer review from intrusive general public scrutiny. All the peer review communications are protected from discovery and use in any form of legal proceeding."). Although MCL 331.531(1) provides that a person or entity "may provide to a review entity information or data relating to the physical or psychological condition of a person, the necessity, appropriateness, or quality of health care rendered to a person, or the qualifications, competence, or performance of a health care provider," this does not authorize the review entity to waive statutory confidentiality on behalf of the person or entity who provided the information. Moreover, plaintiff is not a review entity.

Moreover, this Court has held that MCL 331.532, which provides an exception to the prohibition in MCL 331.533, "refers only to the release of information for the purpose of assisting a health care facility in determining whether a health care professional has the qualifications, competence, and performance needed to be selected and appointed to a medical staff position." *Dye*, 230 Mich App at 673. This provision does not support plaintiff's waiver argument with respect to the instant lawsuit.

In addition, the decision in *Feyz*, contradicts plaintiff's argument that the physician who is disciplined or denied privileges is entitled to discovery of these materials. *Feyz* applied the statutory peer-review regime in the context of a lawsuit by a physician who was disciplined by the defendant hospital. *Feyz*, 475 Mich 663. The Court held that peer-review communications are protected from discovery and use in "any form of legal proceeding." *Id*. at 685.

Accordingly, the trial court did not err by precluding plaintiff's requested discovery of peer-review documents associated with plaintiff's reappointment proceedings. The documents are within the scope of the statutory peer-review privilege.

We review de novo plaintiff's claim that the trial court erred by granting summary disposition in favor of defendant with respect to plaintiff's claims for breach of contract. *Maiden v Rozwood*, 461 Mich 109, 118, 120; 597 NW2d 817 (1999). A motion under MCR 2.116(C)(10) "tests the factual sufficiency of the complaint," and we must consider the "affidavits, pleadings, depositions, admissions, and other evidence submitted by the parties in the light most favorable to the party opposing the motion." *Id*. at 120. "When a motion under [MCR 2.116(C)(10)] is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his or her pleading, but must, by affidavits or as otherwise provided in this rule, set forth specific facts showing that there is a genuine issue for trial." MCR 2.116(G)(4). The motion is properly granted when "there is no genuine issue regarding any material fact and the moving party is entitled to judgment as a matter of law." *Greene v AP Prod, Ltd*, 475 Mich 502, 507; 717 NW2d 855 (2006). A genuine issue of material fact exists when the record leaves open an issue upon which reasonable minds could differ. *In re Lett Estate*, 314 Mich App 587, 595; 887 NW2d 807 (2016). "[P]arties opposing a motion for summary disposition must present more than conjecture and speculation to meet their burden of providing evidentiary proof establishing a genuine issue of material fact." *Fields v SMART*, 311 Mich App 231, 237-238, 874 NW2d 715 (2015). "Questions involving the proper interpretation

of a contract or the legal effect of a contractual clause are also reviewed de novo." *McDonald v Farm Bureau Ins Co*, 480 Mich 191, 197; 747 NW2d 811 (2008).

"[C]ontracts are enforced according to their terms[,]" which "is a corollary of the parties' liberty to contract." *Coates v Bastian Bros, Inc*, 276 Mich App 498, 503; 741 NW2d 539 (2007). This Court examines the language in a contract according to "its ordinary and plain meaning if such would be apparent to a reader of the instrument." *Wilkie v Auto-Owners Ins Co*, 469 Mich 41, 47; 664 NW2d 776 (2003). Where a term is not defined in a contract, "it is accorded its commonly understood meaning." *Twichel v MIC Gen Ins Corp*, 469 Mich 524, 534; 676 NW2d 616 (2004). "If the language of the contract is unambiguous, we construe and enforce the contract as written." *Quality Prod & Concepts Co v Nagel Precision, Inc*, 469 Mich 362, 375; 666 NW2d 251 (2003).

Employment contracts are interpreted according to the same rules of construction that apply to other contracts. *Bruno v Detroit Institute of Technology*, 36 Mich App 61, 64; 193 NW2d 322 (1971). Generally, employment relationships of indefinite duration are presumed to be terminable at the will of either party. *Lytle v Malady*, 458 Mich 153, 163; 579 NW2d 906 (1998). "However, the presumption of employment at will can be rebutted so that contractual obligations and limitations are imposed on an employer's right to terminate employment." *Id*. "[A]n employer's express agreement to terminate only for cause . . . can give rise to rights enforceable in contract." *Toussaint v Blue Cross & Blue Shield of Mich,* 408 Mich 579, 610; 292 NW2d 880 (1980). So "where an employer has agreed to discharge an employee for cause only, its declaration that the employee was discharged for unsatisfactory work is subject to judicial review." *Id*. at 621.

An exception to judicial review of wrongful termination cases exists where the "just cause" employment contract provides the employer with sole discretion to decide whether cause exists to justify the employee's termination. *Thomas v John Deere Corp*, 205 Mich App 91, 94-95; 517 NW2d 265 (1994). In other words, it is a "fundamental proposition that parties to an employment contract are free to bind themselves to whatever termination provisions they wish." *Id*. at 93-94; see also *Meagher v Wayne State Univ*, 222 Mich App 700, 721-723; 565 NW2d 401 (1997). Thus, rather than agreeing to "at-will" or reviewable "just-cause" termination provisions, parties may choose something that "lies between the two extremes" by agreeing to a provision that grants the employer sole discretion to determine whether just cause exists. *Thomas*, 205 Mich App at 94-95. "This decision-making approach protects defendant's employees from some risks that truly at-will employees face, such as being fired rashly in a fit of pique, and being fired only because of a personality conflict with an immediate supervisor that does not affect job performance." *Id*. at 95 n 1. For example, in *Thomas*, the plaintiff could be terminated only for good and just cause, and the decision whether good and just cause existed would be made by the plaintiff's supervisor, his supervisor's superior, and a personnel representative. *Id*. at 95. Because the defendant had sole authority to determine the existence of

good and just cause, this Court determined that judicial review of the termination decision was prohibited. *Id*.[1]

In this case, defendant's bylaws provide:

> Within thirty (30) days after the conclusion of the appellate review, the Board of Directors shall render its final decision in the matter in writing and shall send notice thereof to the practitioner, to the President of the Staff, and to the Executive Committee. If this decision is in accord with the Executive Committee's last recommendation in the matter, if any, it shall be immediately effective and final. If the Board of Directors' action has the effect of changing the Executive Committee's last such recommendation, if any, the Board of Directors shall refer the matter to a joint conference as provided In part b. of this Section. The Board of Directors' action on the matter following receipt of the Joint conference recommendation shall be immediately effective and final.

This language supports the trial court's determination that the decision by defendant's board of directors with respect to an appointment or reappointment application is final and that the board's decision with respect to an appeal is final. Plaintiff is incorrect that some sort of "sole discretion" language is required. For example, in *Thomas*, the parties' agreement provided that the "decision whether good and just cause existed would be made by plaintiff's supervisor, his supervisor's superior, and a personnel representative." *Thomas*, 205 Mich App at 95. Therefore, because the sole discretion to make the summary termination decision rested with defendant's board of directors, plaintiff cannot state a claim for breach of contract, and this Court may not review the board's decision so long as the decision was made in the manner required by the agreement, and the board did not otherwise act unlawfully, such as by engaging in improper discrimination. See *Thomas*, 205 Mich App at 95.

Plaintiff relies on *Renny v Port Huron Hosp*, 427 Mich 415; 398 NW2d 327 (1986), for the position that the procedure used must also be "fundamentally fair" to avoid judicial review. *Renny*, however, involved a straight "just-cause" employment provision with the defendant arguing that a just-cause employment contract could not be established solely by an employee handbook. *Id*. at 417-418. In *Renny*, the Court held that

> where an employee has expressly consented to submit a complaint to a joint employer-employee grievance board established by the employer with the knowledge that the resulting decision is final and binding, the decision shall be final unless the court finds as a matter of law that the procedures used did not comport with elementary fairness. If the court so finds, the merits of the case may be submitted to the jury to determine if, in fact, the employee was fired for just cause. [*Id*. at 418.]

---

[1] Although plaintiff contends that other cases have criticized *Thomas* as not being compatible with *Toussaint*, this Court is bound to follow *Thomas*. MCR 7.215(J).

In *Renny*, the Court identified five "essential elements" to a fair process: (1) adequate notice, (2) opportunity to present evidence and arguments, (3) formulation of issues of law and fact, (4) a rule of finality, and (5) other procedural elements demanded by the particulars of the case. *Id*. at 437. This formulation is substantially similar to the classic definition of procedural due process, requiring notice and the opportunity to be heard. See *Hinky Dinky Supermarket, Inc v Dep't of Community Health,* 261 Mich App 604, 606; 683 NW2d 759 (2004). In *Renny*, the Court held that the proceeding was generally unfair because the plaintiff was not given *any* opportunity to "present evidence and arguments and the fair opportunity to rebut evidence and argument by the opposing argument." *Id.* at 437-438. These deficits are not present in the instant case. Plaintiff was afforded a number of levels of review, and he was permitted to present testimony and evidence, to outline his arguments, and to rebut defendant's evidence. He was provided with ample notice and an opportunity to be heard.

With respect to plaintiff's claim concerning defendant's compliance with the procedures set forth in the agreement, plaintiff bases his claim largely on the fact that the reappointment application stated that it could be amended. But neither the application itself nor any ability to amend it is part of the grievance procedure itself. Rather, this began after the December 11, 2015 letter from defendant stating that the Medical Education Committee (MEC) had voted to deny plaintiff's reappointment application and advising him of his right to appeal that decision. Moreover, plaintiff did in fact have an opportunity to amend his application. According to defendant's Senior Vice President and Chief Medical Officer, Dr. David Walters, plaintiff stated during a December 1, 2015 meeting that he had obtained recertification by the Osteopathic Board of Cardiology and could produce a letter demonstrating this. Walters informed plaintiff that the MEC was scheduled to meet the next day, and plaintiff could provide the letter before the meeting, which would allow 24 hours to amend plaintiff's application. Plaintiff never provided the letter.

Plaintiff also argues that defendant failed to follow its own procedures because the MEC failed to provide any insight for why it affirmed the report and recommendation of the Hearing Committee. We disagree. The provision in defendant's bylaws on which plaintiff relies states that the MEC was required to provide plaintiff with "a copy of the recommendation or decision, and basis for the recommendation or decision. " But the provision does not describe any particular method or level of detail; it only requires that the basis for the decision be provided to plaintiff. Our review of the various decisions of the reviewing bodies, including the hospital board's ultimate decision, discloses that defendant adhered to the requirement in its bylaws. All of the reports provided the rationale for the decisions each reviewing body made and the materials on which they relied. Accordingly, plaintiff has not demonstrated a violation of the bylaws. Therefore, because plaintiff has not shown that the board made its final decision in violation of the bylaw procedures or other provisions, the trial court did not err when it dismissed plaintiff's claims for breach of contract.

Plaintiff next argues that the trial court erred when it granted summary disposition in favor of defendant with respect to plaintiff's claim for tortious interference with his business relationship with his patients. We also disagree.

In *BPS Clinical Laboratories v Blue Cross & Blue Shield of Mich*, 217 Mich App 687, 698-699; 552 NW2d 919 (1996), this Court stated:

The elements of tortious interference with a business relationship are the existence of a valid business relationship or expectancy, knowledge of the relationship or expectancy on the part of the defendant, an intentional interference by the defendant inducing or causing a breach or termination of the relationship or expectancy, and resultant damage to the plaintiff. To establish that a lawful act was done with malice and without justification, the plaintiff must demonstrate, with specificity, affirmative acts by the defendant that corroborate the improper motive of the interference. Where the defendant's actions were motivated by legitimate business reasons, its actions would not constitute improper motive or interference. [Citations omitted.]

In *Feyz*, our Supreme Court addressed the concept of "malice" in the context of hospital staffing decisions made under the peer-review process, stating:

[W]e hold that malice can be established when a person supplying information or data [to a peer review entity] does so with knowledge of its falsity or with reckless disregard of its truth or falsity. Similarly, a review entity is not immune from liability if it acts with knowledge of the falsity, or with reckless disregard of the truth or falsity, of information or data which it communicates or upon which it acts. [*Feyz*, 475 Mich at 667 (citation and quotation marks omitted).]

Regarding plaintiff's discussion of the "judicial doctrine of non-intervention," we point out that in addition to the statutory non-disclosure provisions that shield peer-review materials from discovery, other statutes provide immunity for entities participating in the peer-review process, *Feyz*, 475 Mich at 680-683, because "[p]eer review is essential to the continued improvement in the care and treatment of patients. Candid and conscientious evaluation of clinical practices is a *sine qua non* of adequate hospital care." *Id*. at 680 (quotations omitted). Before the decision in *Feyz*, this Court had treated these statutes as effectively creating a "judicial doctrine of non-intervention" in which courts could not review a private hospital's staffing decisions. *Id*. at 674-679. The *Feyz* Court rejected this doctrine and absolute immunity to the extent that "[a] person, organization, or entity that has acted with malice when engaging in a peer review function is not protected from liability." *Id*. at 682-683. Therefore, in order to prevail on his claim, plaintiff must show either that the person supplying information to the peer-review entity did so with knowledge of the falsity of the information or "with reckless disregard of its truth or falsity," or that the MEC, the Hearing Committee, or the hospital board acted with knowledge of the information's falsity, or with reckless disregard of whether it was true. *Id*. at 667, 690. Plaintiff has not met this burden.

Plaintiff argues that a question of fact exists regarding the validity of defendant's conclusion that plaintiff made misrepresentations concerning his suspension from another hospital and whether his board certifications were current. However, on February 1, 2018, the disciplinary subcommittee of the Board of Osteopathic Medicine and Surgery, a part of the Bureau Of Professional Licensing in the Department of Licensing and Regulatory Affairs, entered a consent order fining plaintiff $2,000 after plaintiff stipulated to having misrepresented

both his board certification status and his June 3, 2015 suspension from another hospital when re-applying for staff privileges at defendant hospital.[2] As part of the stipulation, which plaintiff signed on November 24, 2017, plaintiff both admitted that the facts in the administrative complaint were true and that they constituted violations of MCL 333.16221(b)(*iv*) (which pertain to "[l]ack of good moral character"). Given this evidence and plaintiff's own admissions in his complaint and accompanying documentation, we agree with the trial court that plaintiff cannot demonstrate that defendant knowingly relied on false information or acted with reckless disregard of the truth concerning these grounds for not renewing plaintiff's privileges.

Moreover, plaintiff's counsel conceded below that defendant did not "[act] with knowledge of the falsity, or with reckless disregard of the truth or falsity" in basing its decision in part on the concerns surrounding plaintiff's patient procedures in the Cardiac Catheterization Lab. Thus, having made this concession below, plaintiff may not assert a contrary position on appeal as an appellate parachute. *Marshall Lasser, PC v George*, 252 Mich App 104, 109; 651 NW2d 158 (2002). In any event, plaintiff acknowledges on appeal that, as a result of the initial peer review of his earlier cases, he was at least "strongly encouraged" not to perform procedures that involved an undue risk to patients, that he agreed to this condition, but that he continued to perform these procedures. Walters stated that the physician who conducted peer review on plaintiff's subsequent cases reported that plaintiff had continued to perform procedures using the AngioJet procedure, including in cases where such a procedure was deemed harmful in a recommendation by the American College of Cardiology and American Heart Association. Walters also stated that the reviewing physician reported that plaintiff continued to perform "several aortograms and ventriculograms without any clear indications for the procedure." Further, plaintiff acknowledged below that the reviewing physician had continued to express concerns to him about his still performing these procedures after the second peer review.

Plaintiff also suggests that there is a genuine issue of material fact regarding whether defendant acted with malice because its denial of his reappointment application for all of his medical staff privileges was not supported by evidence of his patient care in the Cath Lab. As discussed earlier, however, plaintiff cannot show that defendant acted with knowledge of falsity or with reckless disregard of the truth of the underlying information or data that formed the reason for its decision. Plaintiff thus cannot establish malice in this situation.

Plaintiff also maintains that there was a question of fact as to whether any of the alleged concerns about patient safety were actual concerns since plaintiff was not summarily suspended from the Cath Lab and was allowed to continue to treat patients for three weeks-- until the end of December 2015. This argument is mere conjecture. Plaintiff presented no evidence that defendant allowed him to continue treating patients at the laboratory because defendant did not actually believe that he posed a risk to patients.

---

[2] This Court granted defendant's motion to expand the record on appeal to include this consent order. *Rasak v Botsford Gen Hosp*, unpublished order of the Michigan Court of Appeals, entered August 21, 2018 (Docket No. 339614).

In sum, because plaintiff cannot demonstrate malice, the trial court did not err when it granted summary disposition in favor of defendant with respect to plaintiff's tortious interference claim.

Plaintiff lastly argues that the trial court erred when it declined to extend an initial status quo order that permitted him to perform a more limited role at the hospital pending the resolution of this case. But in light of our disposition of plaintiff's other claims of error and our conclusion that the trial court properly dismissed plaintiff's claims, we do not reach this issue.

We affirm. As the prevailing party, defendant may tax costs. MCR 7.219.

/s/ Michael J. Kelly
/s/ Jane E. Markey
/s/ Karen M. Fort Hood