*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

AMIR KAKI, M.D.,

      Plaintiff/Counterdefendant-Appellee,

v

TENET HEALTHCARE CORPORATION, VHS, INC., VHS OF MICHIGAN, INC., VHS HARPER-HUTZEL HOSPITAL, INC., VHS SINAI-GRACE HOSPITAL, INC., VHS DETROIT RECEIVING HOSPITAL, INC., ANTHONY TEDESCHI, SCOTT STEINER, ERIC EVANS, CONRAD MALLET, JOHN LEVY, JOHN HAAPANIEMI, MEHMET BAYRAM, SHAWN LEVITT, FRANK TORRE, RUDOLPH P. VALENTINI, ERICA WARD GERSON, ALAN WOODLIFF, and KEITH PITTS,

      Defendants/Counterplaintiffs-
      Appellants.

UNPUBLISHED
May 30, 2024

No. 364976
Wayne Circuit Court
LC No. 22-012640-CZ

Before: FEENEY, P.J., and M. J. KELLY and RICK, JJ.

PER CURIAM.

Defendants/counterplaintiffs, hereafter defendants, appeal as of right the trial court's order granting the motion of plaintiff/counterdefendant, hereafter plaintiff, to confirm the arbitration award. We affirm.

## I. FACTUAL HISTORY

Defendant Tenet Healthcare Corporation (Tenet), through its subsidiaries, operates hospitals nationally, including in southeast Michigan. Defendant VHS of Michigan, Inc., is a wholly owned subsidiary of defendant Tenet, doing business in Michigan as the Detroit Medical Center (DMC). Defendants VHS Harper-Hutzel Hospital, Inc. (Harper-Hutzel), VHS Sinai-Grace Hospital, Inc. (Sinai-Grace), and VHS Detroit Receiving Hospital, Inc., are hospitals within the DMC health system and wholly owned subsidiaries of defendant Tenet. Defendant VHS, Inc., is

also a subsidiary of defendant Tenet.[1] Plaintiff is a prominent cardiologist who was previously employed by defendant Tenet to serve at various DMC hospitals.

This case arises out of the termination of plaintiff's directorship agreement with the DMC and the posttermination denial of his membership and medical staff privileges, which plaintiff claims were taken in retaliation for voicing complaints regarding compromises to patient safety and fraudulent billing by defendants. Plaintiff was recruited by the previous DMC president to serve as director of the DMC cardiac catherization services unit in 2012 and the underlying directorship agreement was repeatedly renewed, with the last agreement dated July 6, 2018; plaintiff was also provided with membership and privileges, which were routinely renewed until 2019. Plaintiff regularly voiced complaints regarding the lack of quality care at defendant Sinai Grace's hospital and the failure of its peer review process to address underperforming physicians, in addition to unsterile medical equipment and physician suspensions without notice. Defendant Eric Evans, president of defendant Tenet's hospital operations, subsequently expressed his displeasure with plaintiff for raising the aforementioned concerns in a group setting. In March 2018, defendant Evans and defendant Anthony Tedeschi, the DMC Chief Executive Officer (CEO), determined that the termination of plaintiff's directorship was necessary and they engaged Latham & Watkins, LLP (Latham Watkins), to investigate the cardiology department. Latham Watkins issued its investigative report on September 27, 2018, contending plaintiff repeatedly violated his directorship agreement, defendant Tenet's standards of conducts, and the DMC "disruptor provider" policy[2] by yelling at DMC staff and fellow physicians, using obscenities, and behaving in a physically threating way; the allegations were supported by questionable witness reports that lacked attribution and detail, or review forms that were never previously shared with plaintiff.

Plaintiff was never subject to any formal discipline by the DMC until his directorship agreement was terminated on October 1, 2018, due to anonymous complaints contending plaintiff suffered from behavioral issues and failed to properly supervise his fellows; the complaints were subsequently found to be unsubstantiated. While plaintiff continued to have membership and privileges at the DMC, he was barred from participating in the on-call schedule, training fellows, teaching at the affiliated medical schools, and he was provided only two days to vacate his DMC office. Plaintiff applied for the renewal of his membership and medical staff privileges at the DMC in 2019; the DMC internal medicine department recommended the aforementioned renewal with significant conditions attached, which the DMC credentials committee agreed with. The DMC

---

[1] We will refer to defendant Tenet and its aforementioned defendant-subsidiaries as "hospital defendants," the individual defendants, who are members of the DMC governing body, internal review committees, or leadership, as "individual defendants," and all defendants collectively as "defendants."

[2] The DMC disruptive provider policy is an internal human resources policy used to remediate problematic physician behavior that may compromise patient safety; the aforementioned policy defines "disruptive behavior" as " ' [i]nappropriate displays of anger or resentment (examples include but are not limited to verbal outbursts, condescending language or voice intonation; abusive language, impatience with questions . . . threats of violence . . . [or] [i]nappropriate words or actions directed toward another person . . . .' "

medical executive committee (MEC) additionally endorsed the renewal of plaintiff's privileges and membership, however, it would be for a one-year period with several stipulations. The MEC's recommendation was provided to the DMC governing body; the governing body maintained the final decision-making authority regarding the application for membership and privileges at DMC facilities.

The DMC governing body voted to deny membership and privileges to plaintiff on April 26, 2019; plaintiff received a letter conveying the adverse recommendation on April 29, 2019, detailing the denial was based on concerns regarding quality of care, medical necessity, and patient safety. The letter also detailed issues previously undisclosed to plaintiff and matters that were never the subject of any DMC peer review, disciplinary, or remedial measures. Plaintiff subsequently appealed the DMC governing body's decision; the appeals process was directed by the medical review committee hearing ("fair hearing") panel. Plaintiff's fair hearing proceedings occurred on August 21, 2019 through August 22, 2019, and featured the testimony of several witnesses and the presentation of evidence. The hearing panel included four physicians uninvolved with plaintiff or his practice who found that the DMC governing body's denial of plaintiff's membership and medical staff privileges was " 'incorrect, unjustified, unreasonable, [sic] not substantiated by the evidence and unfounded.' " The fair hearing panel recommended plaintiff's membership and privileges be reinstated without conditions.

The relevant bylaws required plaintiff's matter be returned to the MEC after the fair hearing, and while this occurred on October 21, 2019, the matter was only reviewed for "informational purposes" and there was no vote. Rather, the MEC issued its previous recommendation and it notified plaintiff accordingly on October 24, 2019. Plaintiff was entitled to an ad-hoc appeal committee review before the case returned to the DMC governing body for a final vote. The DMC governing body convened on April 24, 2020, and it opted to deny membership and medical staff privileges to plaintiff for the second time, contending the decision was " 'primarily based on concerns about [his] disruptive behavior as well as on concerns about quality and aggressive use of invasive procedures, lack of appropriate supervision, and conflicts of interest that were not adequately disclosed if at all.' "

## II. PROCEDURAL HISTORY

Plaintiff subsequently filed a complaint in the United States District Court for the Eastern District of Michigan and the Wayne Circuit Court contesting the defendants' termination of his directorship, membership, and medical staff privileges under the False Claims Act (FCA), 31 USC 3730 *et seq*., and various state laws. The matters were subsequently dismissed because the parties stipulated that all claims would be adjudicated per the arbitration provision in plaintiff's directorship agreement which required any issues arising out of, or related to, the aforementioned agreement to be resolved by the Judicial Arbitration and Mediation Services (JAMS) and for Michigan law to apply. The underlying arbitration occurred at the JAMS Detroit Resolution Center for 18 days in September 2020 through October 2020. On December 18, 2020, the arbitrator issued the final arbitration award, determining plaintiff was successful regarding several claims and mandating defendants reinstate plaintiff's DMC membership and medical staff privileges, in addition to providing monetary damages.

On November 2, 2022, plaintiff filed a motion to confirm the arbitration award in the Wayne Circuit Court requesting that the trial court both enter an order confirming the award, and enter a judgment against defendants consistent with the monetary damages awarded, pursuant to the Federal Arbitration Act (FAA), 9 USC 1 *et seq.*, and the Michigan Uniform Arbitration Act (MUAA), MCL 691.1681 *et seq.* On November 28, 2022, defendants filed a motion to vacate the arbitration award contending (1) the arbitrator manifestly disregarded the law when she determined a liability release provision signed by plaintiff was unenforceable regarding claims against certain defendants, (2) the arbitrator improperly stripped the DMC governing body of the statutory immunity it was entitled to under the Healthcare Quality Improvement Act of 1986 (HCQIA), 42 USC 11101 *et seq.*, and (3) the arbitrator violated established Michigan law when she issued duplicative awards of front pay damages and reinstatement regarding plaintiff's membership and medical staff privileges.

On January 19, 2023, the trial court held a motion hearing to address the parties' cross-motions regarding the arbitration award and it determined defendants failed to demonstrate that the arbitrator engaged in a manifest disregard of the law, or otherwise exceeded the scope of her authority, as to warrant vacatur of the arbitration award. On January 24, 2023, the trial court entered an order denying defendants' motion to vacate the arbitration award. On January 26, 2023, the trial court entered an order granting plaintiff's motion to confirm the arbitration award. This appeal ensued.

## III. LIABILITY RELEASE PROVISION

Defendants argue that the trial court erred when it granted plaintiff's motion to confirm the arbitration award because the arbitrator's contradictory rulings regarding whether the liability release signed by plaintiff was effective constituted a material and substantial error of law. We disagree.

Generally, courts have a limited role in reviewing arbitration awards. This Court reviews de novo a trial court's decision whether to enforce, vacate, or modify an arbitration award. *Ann Arbor v American Federation of State, Co, & Muni Employees (AFSCME) Local 369*, 284 Mich App 126, 144; 771 NW2d 843 (2009). "A court may not review an arbitrator's factual findings or decision on the merits." *Id.* Rather, a court may only review an arbitrator's decision for errors of law. *TSP Servs, Inc v Nat'l-Standard, LLC*, 329 Mich App 615, 620; 944 NW2d 148 (2019).

Not every error of law by an arbitrator, however, mandates subsequent court intervention.

> [W]here it clearly appears on the face of the award or the reasons for the decision as stated, being substantially a part of the award, that the arbitrators through an error in law have been led to a wrong conclusion, and that, but for such error, a substantially different award must have been made, the award and decision will be set aside. [*Id.* (quotation marks and citation omitted).]

Moreover, in evaluating whether there is legal error, a court cannot engage in a review of an arbitrator's mental process, but instead must review "the face of the award itself." *Hope-Jackson v Washington*, 311 Mich App 602, 613; 877 NW2d 736 (2015). Furthermore, the legal error must be so egregious as to materially affect the outcome of the arbitration and plainly "demonstrate a

disregard of principles fundamental to a fair resolution of the dispute," or " unequivocally generate a legally unsustainable result, [such] that [the erroneous legal conclusion] cannot be said to be within the parties' agreement to arbitrate or the arbitrator's authority." *Id*. (quotation marks and citation omitted).

The liability release provision detailed in plaintiff's application for DMC membership and medical staff privileges dictated the following:

> I release from liability the hospital(s) and all third parties from any statements made or any action taken in good faith and without malice in connection with this application or any other applications made simultaneously herewith, and in connection with any proceedings for reappointment, and/or clinical privileges (including the granting, extension, reduction, suspension or termination thereof) or in connection with a transfer to any other department or section of the medical staffs, or in connection with any other form of review of my qualifications and competence or of my professional practices in the hospital(s) conducted in accordance with the medical staff bylaws.

The trial court did not err when it granted plaintiff's motion to confirm the arbitration award. The arbitrator did not violate any fundamental legal principles or generate a legally unsustainable result when she determined that multiple defendants acted with malice in connection with plaintiff's application for membership and medical staff privileges. Thus the liability release provision was inapplicable to defendant Tedeschi, defendant Evans, defendant Scott Steiner, who was the DMC president, and hospital defendants. As a preliminary matter, the parties' liability release provision is a contract, and this Court is barred from reviewing the arbitrator's interpretation of the release or her factual findings. See *AFSCME*, 284 Mich App at 144 (stating, "a reviewing court cannot engage in contract interpretation, which is an issue for the arbitrator to determine"). Accordingly, "as long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, a court may not overturn the decision even if convinced that the arbitrator committed a serious error." *Id*. at 144-145 (quotation marks and citation omitted).

The arbitrator properly examined whether the liability release provision delineated in plaintiff's application for DMC membership and privileges was applicable to defendants, which required that any relevant action be taken "in good faith and without malice." The arbitrator cited the "malice" standard provided in *Feyz v Mercy Mem Hosp*, 475 Mich 663, 687; 719 NW2d 1 (2006), and she further dictated " 'plaintiff must establish that defendant's [sic] denial of his reappointment was made with a dishonest belief, purpose of motive, and with a desire to cause plaintiff pain, injury or distress[,]' " which mimics the definition of "good faith" and "malice" as provided in *Black Law's Dictionary* and *Merriam-Webster's Collegiate Dictionary*.[3] See *Auto*

---

[3] "Good faith" is defined in *Black's Law Dictionary* (11th ed), in part, as "(1) a state of mind consisting in honesty in belief or purpose, (2) faithfulness to one's duty or obligation." "Bad faith" is defined in *Black's Law Dictionary* (11th ed) as "dishonesty of belief, purpose, or motive." "Malice" is demarcated in *Black's Law Dictionary* (11th ed) as "the intent, without justification or

*Owners Ins Co v Seils*, 310 Mich App 132, 145; 871 NW2d 530 (2015) (providing, "A dictionary may be consulted to ascertain the plain and ordinary meaning of words or phrases used in the contract"). Based on the arbitrator's determination that the decision to deny plaintiff's membership and privileges was made in retaliation for protected activity pursuant to the FCA, the arbitrator further resolved that the underlying evidence also precluded the application of the liability release provision to hospital defendants, in addition to defendants Evans, Tedeschi, and Steiner. The arbitrator found the aforementioned defendants desired to cease plaintiff's patient safety advocacy, which included contentions that defendants billed improper procedures to Medicare and Medicaid and various Sinai Grace physicians were involved in fraudulent activity. The arbitrator cited Michigan caselaw to justify her legal conclusions and she extensively detailed defendants' conduct throughout the underlying investigative proceedings that was indicative of malice or bad faith.

Defendants also contend that the arbitrator issued an inconsistent award because she advanced that the DMC governing body acted with the "reasonable belief" that denying membership to plaintiff was necessary to promote patient care and safety, but the DMC governing body also rendered its privilege decision with malice, dishonest belief, and a desire to cause plaintiff pain, injury, or distress— an inherently inconsistent premise. Defendants conflate, however, the statutory frameworks relevant to the enforceability of the liability release provision, which is a matter of contract interpretation, and whether defendants were entitled to immunity regarding the denial of plaintiff's membership and medical staff privileges, which is governed by HCQIA. The statutory language of the HCQIA, particularly 42 USC 11112(a), does not mention the terms "malice" or "good faith;" rather, it determines whether a governing body's actions were "reasonable." Defendants additionally assert that plaintiff attributes the DMC governing body's denial of plaintiff's membership and medical staff privileges to the malicious acts of defendant Tedeschi, defendant Evans, and defendant Steiner. Plaintiff then argues the arbitrator appropriately concluded the DMC governing body thus acted with malice. The evidentiary record fails to support these contentions, however. Defendants advance that the aforementioned defendants were not members of the DMC governing body and their malicious acts thus could not be ascribed to the governing body, plus the arbitrator never concluded that the remaining governing body members were simply "dupes."

Defendants, again, distort the arbitrator's factual findings and legal analysis regarding the conduct of the DMC governing body, the individual defendants, and the hospital defendants under the FCA and contract interpretation doctrines, as opposed to the HCQIA, in addition to misconceiving plaintiff's argument. The arbitrator determined that defendants Tedeschi, Evans, and Steiner preordained the termination decision and they purposefully launched the questionable Latham Watkins investigation against plaintiff in order to deny plaintiff medical staff privileges, and the DMC governing body merely "rubberstamped" the aforementioned defendants' malicious conclusion regarding plaintiff's removal. The DMC governing body heavily relied on the results from the questionable Latham Watkins investigation in its decision regarding plaintiff, and it deliberated for a short period of time before determining the denial of plaintiff's membership and

---

excuse, to commit a wrongful act," and in *Merriam-Webster's Collegiate Dictionary* (11th ed) as a "desire to cause pain, injury, or distress to another."

privileges was appropriate, despite all the internal review committees recommending a contrary conclusion. The arbitrator concluded that the conduct of defendant Tedeschi, defendant Evans, and defendant Steiner were the "but for" cause of the DMC governing body's decision to deny the renewal of plaintiff's medical staff privileges.

The arbitrator also noted there was insufficient evidence that defendant John Levy, the chairman of the DMC governing body, acted with malice but he acted in careless disregard of the truth; the remaining individual defendants, while not liable for the retaliation claims based on the FCA's inapplicability to nonemployer defendants, were released from liability based on the contested release provision. The arbitrator did not conclude that the DMC governing body, itself, acted with malice because that is not the appropriate inquiry under the HCQIA, as previously detailed. Rather, it imputed the malicious conduct of defendants Tedeschi, Evans, and Steiner onto hospital defendants for purposes of the FCA, as it constituted retaliation for protected activity. Because defendants failed to establish that the arbitrator unreasonably construed the liability release provision, exceeded the scope of her authority, or otherwise committed an egregious error evident on the face of the award, the trial court properly granted plaintiff's motion to confirm the arbitration award.

## IV. HEALTHCARE QUALITY IMPROVEMENT ACT

Defendants also argue that the trial court erred when it granted plaintiff's motion to confirm the arbitration award because the arbitrator committed a material and substantial error of law as she failed to recognize that defendants were entitled to statutory immunity under the HCQIA. We disagree, noting the arbitrator devoted 25 pages of her 84-page opinion to a discussion of the HCQIA.

In 1986, the United States Congress (Congress) passed the HCQIA due to the "national need to restrict the ability of incompetent physicians to move from State to State without disclosure or discovery of the physician's previous damaging or incompetent performance." 42 USC 11101(2). Congress further determined that the aforementioned matter may be "remedied through effective professional peer review," but the "[t]hreat of private money damage liability . . . unreasonably discourage[d] physicians from participating in effective professional peer review." 42 USC 11101(3)-(4). Recognizing the "overriding national need to provide incentive and protection for physicians engaging in effective professional peer review," 42 USC 11101(5), Congress enacted the HCQIA to immunize from liability for damages any professional review body that performs, in compliance with the relative statutory requirements, a professional review action. 42 USC 11111(a)(1). HCQIA immunity extends to "any person acting as a member or staff to the [professional review] body," "any person under a contract or other formal agreement with the body," and "any person who participates with or assists the body with respect to the action." 42 USC 11111(a)(1)(B)-(D).

The HCQIA mandates that a professional review action satisfies four conditions for the professional review body to acquire immunity from liability in damages under the HCQIA. 42 USC 11112(a). The action must be taken (1) "in the reasonable belief that the action was in the furtherance of quality health care," (2) "after a reasonable effort to obtain the facts of the matter," (3) "after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances," and (4) "in the

reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement of paragraph (3)." 42 USC 11112(a)(1)-(4). The parties do not contest the arbitrator's findings regarding the first HCQIA factor, 42 USC 11112(a)(1).

Turning to the second factor, defendants identify as a "legal error" a trivial misquotation from a case which considered this factor. Defendants argue that the arbitrator applied the incorrect legal standard in determining the DMC governing body did not make a reasonable effort to obtain the facts of the matter pursuant to the second HCQIA factor, 42 USC 11112(a)(2). Defendants contend that, as opposed to examining whether the totality of the *process* leading up to the professional review action evinced a reasonable effort to acquire the relevant facts, the arbitrator considered whether the *facts* presented by the governing body were sufficient, thereby inappropriately substituting her judgment for that of the decisionmaker. We disagree.

The arbitrator considered whether the DMC governing body advanced a reasonable effort to obtain the facts of the matter under 42 USC 11112(a)(2), which was satisfied if " 'the totality of the facts leading up to the professional review action evidences a reasonable effort to obtain the facts.' " While the arbitrator initially misquoted the standard, as provided in *Meyers v Columbia/HCA Healthcare Corp*, 341 F3d 461, 469 (CA 6, 2003), it is axiomatic that the "totality of the process" includes the facts of what transpired and the arbitrator was entitled to discern whether each step of process indicated a reasonable effort to acquire the facts on defendants' part.

More importantly, the arbitrator recognized that statutory immunity was presumed under the HCQIA unless plaintiff demonstrated by a preponderance of the evidence that at least one of the four requirements was not established such that it would be unreasonable for any person to make the decision made by the DMC governing body in April 2020 to deny membership and privileges to plaintiff. Other than the trivial misquotation, defendants merely attempt to bootstrap their belief that the arbitrator made a factual error in her conclusion that led to a legal error. In essence, defendants are inviting us to review the correctness of the arbitrator's conclusion. Because that is not a court's proper role in reviewing an arbitration decision, we decline the invitation.

Specifically, the arbitrator concluded that plaintiff sustained his burden of demonstrating by a preponderance of the evidence that defendants failed to make a reasonable effort to acquire the facts before its decision to deny membership and privileges, and she opined:

> To summarize, the facts [sic] that [defendants] did not utilize their own policies such as DMC peer review to investigate allegations concerning the behavior and other issues of [plaintiff], or the Disruptor Provider Policy so [plaintiff was] on notice of the specific conduct at issue, the fact that [plaintiff was] not told of the bases of the first denial of membership decision until [he] received the letter from Levy, that is [he was] not offered the opportunity to provide information from [his] perspective, such as any complaints [he was] aware of were not substantiated, [he] did not know of the quality reviews until advised by Latham in the context of a negotiation to relinquish [his] membership, and even then [was] not told what cases were being reviewed so [he] could offer [his] perspective, and that the Board did not consider the facts adduced at the Fair Hearing, that the MEC did not apply its

revised policies to [plaintiff] when the matter returned to the MEC, per the Bylaws after the Fair Hearing, and the fact that the Board did not articulate any objective bases to reject the recommendations provided [to] them, all demonstrate that any reasonable person would find a lack on the part of [defendants] to use reasonable efforts to obtain the facts of the matter before the [DMC Governing Body's] 2020 vote.

The arbitrator extensively considered the various processes underlying defendants' purported efforts to obtain the facts of the matter, and she opined that "any reasonable person" would find defendants failed to do so under the second HCQIA factor, 42 USC 11112(a)(2). Because defendants fail to cite any controlling legal principle the arbitrator breached in her examination, or the arbitrator otherwise exceeded her authority, the trial court did not err in granting plaintiff's motion to confirm the arbitration award.

Because plaintiff only needed to establish that one of the four requirements was not met in order to deny defendants immunity,[4] 42 USC 11112(a), and the arbitrator determined that plaintiff did so on this factor, we need not consider defendants' challenges to the remaining factors. Accordingly, we decline to set aside the arbitrator award based upon defendants' arguments under the HCQIA.

## V. DOUBLE RECOVERY

Defendants also argue that the trial court erred when it granted plaintiff's motion to confirm the arbitration award because the arbitrator exceeded her authority by neglecting to abide the recognized rule that successful plaintiffs cannot be awarded the double recovery of both front pay damages and reinstatement. We disagree.

The arbitration clause in plaintiff's directorship agreement provides the following:

9. ARBITRATION. Any dispute or controversy arising under, out of or in connection with, or in relation to this Agreement, or any amendment hereof, or the breach hereof shall be determined and settled by final and binding arbitration in the county in which the Hospital is located in accordance with the Commercial Rules of Arbitration ("Rules") of the Judicial Arbitration and Mediation Services ("JAMS") before one arbitrator applying the laws of the State. The parties shall attempt to mutually select the arbitrator. In the event they are unable to mutually agree the arbitrator shall be selected by the procedures prescribed by the JAMS Rules. Any award rendered by the arbitrator shall be final and binding upon each

---

[4] See *Brown v Presbyterian Healthcare Services*, 101 F3d 1324 (CA 10, 1996) ("if a plaintiff challenging a peer review action proves, by a preponderance of the evidence, any one of the four requirements was not satisfied, the peer review body is no longer afforded immunity from damages under the Health Care Quality Improvement Act."). See also *Gilbert v Kent County Memorial Hosp*, 64 F4th 44, 51 (CA 1, 2023) ("The HCQIA requires that a professional review action meet four conditions for the professional review body to obtain immunity from liability in damages under the HCQIA.").

of the parties, and judgment thereof may be entered in any court having jurisdiction thereof. The costs shall be borne equally by both parties.

JAMS Rule 24(c), in turn, dictates that "The Arbitrator may grant any remedy or relief that is just and equitable and within the scope of the Parties' Agreement, including, but not limited to, specific performance of a contract or any other equitable or legal remedy."

The arbitrator scrutinized the appropriate damages to award plaintiff pursuant to the aforementioned arbitration provision and the FCA, which entitled successful claimants to the relief necessary to make them whole. The arbitrator first provided, with respect to plaintiff's directorship agreement, that reinstatement was unavailable as a remedy because it would displace innocent parties already bound by contractual relationships. While defendants advanced there was no authority authorizing the reinstatement of plaintiff's medical staff privileges, the aforementioned contention is incorrect as the arbitrator deduced that previous FCA plaintiffs were awarded reinstatement of their privileges and membership at the DMC. Furthermore, the equitable remedy was within the arbitrator's power as, apart from the parties' adoption of the JAMS rules, the directorship agreement is silent as to particular remedies or limitations on the arbitrator's authority. See *Mich Dept of State Police v Mich State Police Troopers Ass'n*, ___ Mich App ___, ____; ___ NW2d ___ (2023) (Docket No. 363241); slip op at 9 (providing, "A reviewing court necessarily substitutes its own judgment for that of the arbitrator when it vacates or modifies an award that was properly granted under the scope of the arbitrator's authority").

The arbitrator determined that a one-year reinstatement of plaintiff's membership, without any conditions, was appropriate, with a start date of February 1, 2021; any subsequent renewals of plaintiff's privileges were subject to the new MEC procedures. Concerning monetary damages, the FCA dictated claimants were entitled to an award of their back pay, doubled, and reasonable front pay per 31 USC 3730(h)(2). The arbitrator relied on the damages chart plaintiff's expert presented and she determined that backpay in the amount of $2,352,718.00 and front pay in the amount of $1,034,892.00 was proper in light of plaintiff's ability to "mitigate somewhat successfully" and his shorter career at the DMC. See *Landin v Healthsource Saginaw, Inc*, 305 Mich App 519, 539; 854 NW2d 152 (2014) (noting, "The question whether the plaintiff's efforts to mitigate damages were reasonable under the circumstances is one for the trier of fact"). The arbitrator further awarded $1 million in exemplary damages due to the emotional distress, humiliation, and reputational harm plaintiff suffered. While the law purportedly treats reinstatement and front pay as alternative remedies, the arbitrator solely granted plaintiff partial reinstatement, as his membership and medical staff privileges were reinstituted for a one-year period but his directorship was not. Furthermore, the FCA provides the following regarding the appropriate relief from retaliatory actions, in pertinent part:

(h) Relief From Retaliatory Actions.—

(1) In general.—

Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful

acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.

(2) Relief.—

Relief under paragraph (1) shall include reinstatement with the same seniority status that employee, contractor, or agent would have had but for the discrimination, 2 times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees. An action under this subsection may be brought in the appropriate district court of the United States for the relief provided in this subsection. [31 USC 3730(h)(1)-(2).]

Under the aforementioned antiretaliation provision, plaintiff was entitled to recover all the relief necessary to make him whole; accordingly, the arbitrator was required to reinstate plaintiff's seniority status to the extent feasible. Defendants engaged in two discrete retaliatory acts resulted in (1) the termination of plaintiff's directorship and associated agreements and (2) the subsequent denial of plaintiff's membership and medical staff privileges. Consequently, plaintiff suffered the loss of multiple distinct types of income and opportunities for income, neither of which were amenable to a sum certain dollar amount due to the status afforded to the directorship position per the arbitrator's factual findings. The arbitrator noted that plaintiff was barred from participating in the on-call schedule, training fellows, and teaching at the affiliated medical schools, and he was provided only two days to vacate his DMC office after his directorship position was terminated. Moreover, the renewal of plaintiff's privileges for a period of one year, after a near one-year absence at the DMC, did not reflect the damages of plaintiff's reputation and his efforts to rebuild his patient base. Accordingly, the award of front pay mitigated the disparity created by the partial reinstatement of plaintiff's previously held positions, and it was neither duplicative nor a breach of the arbitrator's authority under the directorship agreement or the FCA. Because defendants have failed to establish any error on the face of the award warranting vacatur, the trial court did not err when it granted plaintiff's motion to confirm the arbitration award.

Affirmed.

/s/ Kathleen A. Feeney
/s/ Michael J. Kelly
/s/ Michelle M. Rick

-11-